[No. D058298. Fourth Dist., Div. One. Dec. 20, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
FELICIANO COVARRUBIAS, Defendant and Appellant.

**COUNSEL**

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James Dutton and Emily Rebekkah Hanks, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Authorities at the San Ysidro port of entry, at the border between Mexico and the United States, discovered approximately 193 pounds of marijuana hidden in a truck that Feliciano Covarrubias was driving. A jury found Covarrubias guilty of possession of marijuana for sale (Health & Saf. Code, § 11359) (count 1) and transporting more than 28.5 grams of marijuana into California (Health & Saf. Code, § 11360, subd. (a)) (count 2). With respect to count 2, the jury also found true an allegation that the marijuana was not for

personal use (Pen. Code, § 1210, subd. (a)). The trial court placed Covarrubias on formal probation for three years, subject to various conditions, including that he serve 240 days in jail.

On appeal, Covarrubias contends that the trial court erred in admitting the expert testimony of Immigration and Customs Enforcement Special Agent Andrew Flood. Agent Flood testified concerning the structure and practices of drug trafficking organizations, among other issues. We agree that the court erred in admitting Agent Flood's testimony concerning the structure and practices of drug trafficking organizations, but conclude that any error in admitting this testimony was harmless. Accordingly, we affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Pretrial proceedings concerning Agent Flood's testimony*

During a pretrial hearing, defense counsel indicated that the People had provided her with Agent Flood's curriculum vitae, and that it appeared to defense counsel that the People intended to have Agent Flood testify as an expert witness "as to drug trafficking issues." Defense counsel orally moved to exclude "profile evidence and other evidence associated with drug trafficking organizations," arguing that the evidence was irrelevant because Covarrubias was not being charged with "being a drug courier," and that the evidence was more prejudicial than probative. Counsel requested that Agent Flood not be permitted to testify "to things such as the structure of . . . drug organizations and how Mr. Covarrubias and his conduct may have played into that structure."

The prosecutor responded by clarifying that she intended to have Agent Flood testify as to "how these organizations work and why they would use a mule[1] to traffic the drugs across the border." The prosecutor contended that the evidence was "highly relevant." After hearing argument from both counsel, the trial court requested that the parties submit written briefing on the issue.

In response to the court's request, Covarrubias filed a motion in limine to exclude "profile/modus operandi evidence and testimony." In his motion, Covarrubias argued that expert testimony offered to establish that a defendant fits a certain criminal profile is inadmissible. Covarrubias also argued that

---

[1] A "mule" is a slang term used to describe a person who transports drugs across the border for a drug trafficking organization.

testimony concerning the structure of drug trafficking organizations is inadmissible to establish a defendant's knowledge of the presence of drugs in his possession. Covarrubias argued that case law permitting "modus operandi" testimony regarding specific techniques that drug couriers use to smuggle drugs was distinguishable because here there was no evidentiary foundation for such testimony. Specifically, Covarrubias argued that the trial court should preclude Agent Flood from testifying that drug trafficking organizations do not entrust large quantities of drugs to people who are unaware that they are transporting such drugs. Covarrubias contended that the court should not permit Agent Flood to testify as to the value of the drugs seized because such testimony was inflammatory. Finally, Covarrubias argued that testimony as to the value of the marijuana seized was irrelevant because it relied on a "*double* inference: (first inference) that [Covarrubias] knew [h]e was carrying drugs because; (second inference) drug dealers would not entrust drugs to unknowing individuals."[2]

The People filed a brief in which they maintained that the trial court should admit expert testimony concerning "drug trafficking organizations and how they work" at trial. The People argued: "Here, . . . the People do not intend to introduce any testimony that defendant meets the profile of a drug carrier or drug mule. The expert will not be testifying about the facts of this particular case. Rather, the expert will testify about marijuana and about drug smuggling in general. The expert will testify to the value of marijuana. The expert will also testify that drug trafficking organizations will pick couriers who they trust. The expert will testify that the organizations are dependent on drivers to get the drugs to their desired destination." The People argued that such testimony was relevant to disprove Covarrubias's anticipated defense that he did not know that there was marijuana in his truck.

The trial court held a hearing pursuant to Evidence Code section 402[3] to consider the admissibility of Agent Flood's testimony. At the hearing, Agent Flood testified about his prior law enforcement experience and training, including his experience conducting narcotics and gang investigations. Agent Flood discussed the various ways in which drugs are packaged for smuggling and stated that many different types of vehicles may be used in smuggling operations. Agent Flood also stated that law enforcement officials were less likely to detect marijuana being transported across the San Ysidro border crossing at times when traffic is lighter, and that the middle of the night was not a high traffic time.

---

[2] Covarrubias indicated that he was willing to stipulate that the quantity of marijuana seized was a "distributable amount," to eliminate the need for testimony as to its value.

[3] Evidence Code section 402, subdivision (b) provides in relevant part: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ."

Agent Flood also discussed the quantity of marijuana that a person might possess for personal consumption and indicated that more than an ounce of marijuana is considered to be a distributable quantity. Agent Flood also discussed the price of marijuana and various factors that affect price, including quality, location, and quantity. Agent Flood testified that the retail value of 193 pounds of marijuana in San Diego was approximately $185,000.

Agent Flood described the various roles that individuals in drug trafficking organizations perform, including growing marijuana, finding vehicles to transport marijuana, building compartments in vehicles to hide the marijuana, recruiting drivers to transport the marijuana, transporting marijuana, distributing marijuana to street level dealers, and selling it on the streets. Agent Flood explained that a "mule" is a person who transports drugs on behalf of the drug trafficking organization. The organization uses recruiters to find mules who are willing to transport drugs for money. Agent Flood stated that drug trafficking organizations often provide vehicles to mules for transporting drugs, but also said that it is common for the vehicle to be registered in the mule's own name, and that a border inspector will often ask more questions of a person who is driving a vehicle that is not registered in his or her own name.[4] Agent Flood explained that drug trafficking organizations also will perform "dry runs" in which a vehicle that the smugglers intend to use at a later time to transport drugs across the border will be driven across the border with no drugs hidden in it, in order to practice the operation and to establish a history of border crossings with a driver and a particular vehicle.

Agent Flood testified that mules are very important to a drug trafficking organization because "they are the ones that bring the drugs into the United States and that's where the money is at." Agent Flood explained that a "blind mule" is a term that is used to refer to a "courier [who] doesn't know what they have on them." Agent Flood testified that a blind mule is a "mythical character," and that he had never been involved with, nor heard of, a case involving a blind mule. Agent Flood also explained why drug trafficking organizations do not use blind mules: "Basically it's a business. You have to look at it not as 193 pounds of marijuana in the car, but say, . . . $185,000 of cash in the car. It's a business. [¶] You don't—the idea of putting drugs . . . on someone and hope to retrieve it somewhere north of the border is—it's guesswork. And in the business of drug trafficking, when you lose that much money, it's that person's life because they are responsible for that amount of money."

---

[4] Agent Flood testified on cross-examination that it was common for drug trafficking organizations to register vehicles in the name of the person transporting the drugs across the border.

On cross-examination, Agent Flood reiterated that he had never come across a case that involved a blind mule, and that "based on [his] training and experience," it was his belief that any time a person is stopped with drugs in his or her vehicle, the person knows that there are drugs in the vehicle.

At the conclusion of the hearing, defense counsel argued that the court should exclude Agent Flood's testimony in its entirety. Defense counsel argued that the testimony was irrelevant and prejudicial, that it was "improper character evidence," and that presentation of the testimony would be unduly time consuming. Defense counsel further argued that allowing the People to elicit Agent Flood's proffered testimony would constitute improper presentation of an expert opinion as to Covarrubias's mental state, i.e., whether he knew that there was marijuana in his truck. Defense counsel also noted that Agent Flood had discussed gangs in his testimony, and requested that the trial court exclude any mention of gangs, pursuant to Evidence Code section 352. Counsel summarized her argument by stating: "So, I'm going to ask the court to, one, exclude it, all of it . . . . [¶] And separately then, I'm asking the court to exclude the bulk of it, certainly the profile information and the different participants and the drug cartel or organization as [Agent Flood] indicated."

In response, the prosecutor argued that evidence pertaining to "drug trafficking information" was admissible to refute Covarrubias's contention that he did not know that there was marijuana in his truck, and that he had "unknowingly carried it across the border." The prosecutor also argued that, at "the very minimum," the court should allow testimony as to the value of the marijuana because Covarrubias was charged with possession for sale, and the "jury has to understand that this is a lot of marijuana and no one would be . . . having this for personal use." The prosecutor argued, in the alternative, that the court should permit the People to offer Agent Flood's testimony in rebuttal if Covarrubias were to testify and deny that he knew there was marijuana in his truck.

The trial court ruled that it would not exclude Agent Flood's testimony, stating that, in the court's view, "a lot of it is relevant." The court further stated, "I don't find that it's substantially more prejudicial than probative. It provides a background to the movement of narcotics from Mexico to the United States. The . . . agent did not express an opinion as to Mr. Covarrubias." However, the trial court did order that Agent Flood not refer to gangs in his testimony, reasoning that such evidence "would introduce an unnecessary element into this as there's no evidence or suggestion that this was tied to or at the behest of gangs." The court summarized its ruling by stating, "I'm prepared to allow [Agent Flood] to testify to the topics that he testified to, basically what different terms mean and essentially values of marijuana, his opinion that drugs are essentially a business and such. But

with the modifications and limitations[5] that I've mentioned." After the court issued its ruling, defense counsel inquired, "So the court is ruling that all of the information such as the organization . . . all of that is going to be allowed to come in?" The court responded in the affirmative.

### B.   *The People's evidence at trial*

#### 1.   *The discovery of marijuana in Covarrubias's truck*

On May 6, 2010, at approximately 3:00 a.m., Covarrubias drove his Ford F-250 truck to the San Ysidro border crossing from Mexico. Customs and Border Protection Agent Rhonda Beyke was screening vehicles at the crossing with Kyra, a dog specially trained to detect narcotics. Kyra began to run in circles around Covarrubias's truck and pulled Agent Beyke toward the truck. Two agents escorted Covarrubias to a secondary screening area. At the secondary screening area, Kyra jumped into the back of Covarrubias's truck and signaled an alert while sitting next to several bags of roofing shingles. Agent Beyke opened one of the bags of shingles and saw several rectangular packages wrapped in tape.

Customs and Border Protection Agent Veronica Morey searched Covarrubias's truck and found seven "identical" bags of roofing shingles in the bed of the truck. The factory seals on all of the bags had been broken, and the bags had been resealed with clear tape. Inside the bags of shingles, agents found separately packaged bundles of marijuana. The packages were wrapped in "cellophane dryer sheets." In total, the marijuana weighed approximately 193 pounds. Agent Morey placed Covarrubias in a cell and told him that he was being held for transporting narcotics into the United States.[6]

---

[5] Although the court referred to "modifications and limitations," the only limitation that the court placed on Agent Flood's testimony was that he not refer to gangs.

[6] Although not material to our decision, it appears that the marijuana was hidden in bundles in each of the seven bags. Agent Morey testified in relevant part as follows:
"[Prosecutor]: How many bags were there again?
"[Agent Morey]: There were seven [bags of] shingles.
"[Prosecutor]: Did they look the same?
"[Agent Morey]: All of them identical.
"[Prosecutor]: And once you got them to the front of the truck, what did you do?
"[Agent Morey]: Then I started separating the shingles and the shingle packages. Half of it had the shingles and then the packages of marijuana were on top of the shingles.
"[Prosecutor]: So did you open each bag?
"[Agent Morey]: I did one at a time. And I separated the packages of marijuana from the shingles.

## 2. *Covarrubias's interrogation*

Immigration and Customs Enforcement Special Agent Mitchell Martinez interrogated Covarrubias shortly after Covarrubias was placed in the cell. Covarrubias initially told Agent Martinez that he was a day laborer, that he was trying to find jobs as a painter, and that he was coming to the United States to find work. According to Agent Martinez, Covarrubias said that he was "going to see—into a roofing job somewhere in Encanto, but he wasn't sure where in Encanto." Agent Martinez asked Covarrubias for additional details concerning the job, including who was going to hire him and the specific location of the job. Covarrubias was unable to provide Agent Martinez with any further details, and said that he "wasn't quite sure if he was going to have [a] roofing job that day."

Agent Martinez asked Covarrubias whether he owned the truck that he had been driving. Covarrubias said that the truck was his, that he had owned it for approximately four to five months, and that he had not lent the truck to anyone.

Agent Martinez asked Covarrubias about the bags of roofing shingles found in the truck. Covarrubias initially told Agent Martinez that he did not know who owned the shingles. Later in the conversation, Covarrubias told Agent Martinez that he owned three of the seven bags of shingles, but that he did not know who owned the other four bags. Covarrubias told Agent Martinez that he had purchased the shingles from Home Depot, but said that he did not have a receipt for the purchase. When Agent Martinez asked Covarrubias why he would have purchased shingles for a roofing job if he was uncertain whether he would have such a job, Covarrubias responded that he did not know, and that this was "the way he did it."

Agent Martinez testified that when he mentioned the marijuana to Covarrubias, "[Covarrubias] didn't act surprised," and Covarrubias said, " 'I ignored it. I ignored it.' "

---

"[Prosecutor]: And how many—it is Monday morning. Were the bags of marijuana evenly distributed among the bags of roofing shingles?
"[Defense counsel]: Objection. Asked and answered.
"The Court: Sustained.
"[Prosecutor]: Your honor, approach?
"The Court: She said we [*sic*] had seven bags of shingles with seven bundles in each one I think we have been over this. Thank you."

### 3. Agent Flood's expert testimony

#### a. Agent Flood's testimony concerning the structure and practices of drug trafficking organizations

Agent Flood testified that he had been involved in hundreds of marijuana smuggling investigations. According to Agent Flood, marijuana can be packaged for smuggling in a variety of ways, including being wrapped in cellophane, together with something to mask the smell of the drug. He also stated that smugglers conceal marijuana in vehicles in many different ways. According to Agent Flood, it was easier to smuggle marijuana through the San Ysidro border crossing during the night, when the crossing was less busy.

Agent Flood testified that he had interviewed people who held many different roles within drug trafficking organizations, including drivers, distributors, and street dealers, and had also interviewed people who manufacture compartments in vehicles to hide drugs, and individuals who package the drugs. According to Agent Flood, of the hundreds of marijuana smuggling suspects that he had interviewed, a "very, very high percentage initially denied knowledge [of the marijuana]."

Agent Flood described the various roles of participants in a drug trafficking organization, including growers, packagers, recruiters, transporters, distributors, and street level dealers. He explained that individuals who transport drugs are sometimes referred to as mules. According to Agent Flood, there are occasionally shortages of persons who are willing to transport drugs, but with difficult economic times, there are people who are willing to make "quick, easy money" by transporting drugs.

Agent Flood testified that transporters sometimes use their own vehicles, or vehicles registered in the transporter's name, when smuggling drugs across the border. He explained that border inspection agents are likely to ask a driver questions if the driver is driving a vehicle that is not registered in the driver's name. In a large majority of the cases in which Agent Flood has been involved, the driver of narcotics has carried a cellular phone. However, in cases in which the driver knows where to take the product, the driver might not carry a phone.

Agent Flood testified that smugglers will perform "dry runs," in which the driver crosses the border without drugs in a vehicle that he intends to use at a later time for smuggling. He explained that dry runs are done so that when border agents perform a "records check, they know, okay, that guy has been in that car before crossing the border." Transporters commonly use older vehicles to smuggle drugs, but may also use newer vehicles. The transporters

get paid at the time of the delivery. Agent Flood stated that a transporter would likely be paid approximately $500 to deliver 190 pounds of marijuana across the border. Transporters are a vital part of drug trafficking organizations; such organizations could not function without their services.

### b. *Agent Flood's testimony concerning "blind mules"*

Agent Flood indicated that he was aware of the meaning of the term "blind mule." However, he said that he had never, in either his training or experience, come across a case in which a drug trafficking organization had used a blind mule. Agent Flood stated, "The blind mule is pretty much—it is fictional. It is the belief that somebody is carrying something that they don't know what they are carrying." Agent Flood stated that there were numerous reasons why a drug trafficking organization would not use a blind mule, including that the organization would not know where the transporter was going and that the organization would be unable to retrieve the drugs once the blind mule had taken the drugs across the border.

### c. *Agent Flood's testimony concerning marijuana*

Agent Flood stated that an average marijuana user would consume less than 10 grams of marijuana in a day, and that marijuana deteriorates over time. He explained that more than an ounce of marijuana[7] is considered to be a distributable quantity and that 193 pounds of marijuana is clearly a quantity intended for distribution rather than personal use. Agent Flood also discussed the price of marijuana, including various factors that affect price. He stated that the retail value of 193 pounds of marijuana grown in Mexico and sold in San Diego is approximately $195,000.[8]

### d. *Agent Flood's testimony concerning whether a particular hypothetical defendant would know that he had marijuana in his vehicle*

On redirect, the prosecutor asked Agent Flood the following hypothetical question: "You have a person drive across the border [at] 3:00 o'clock in the morning in a car . . . he or she has owned for four months. [¶] There's seven bags of roof shingles in the car. The bags have the factory seals removed and the edges are duct taped. The bags are clearly visible to the naked eye. The bags are in the truck with tools and other items. The person is stopped at the border and marijuana is found evenly distributed in the bags. [¶] The person

---

[7] Agent Flood testified that there are approximately 28 grams in an ounce.

[8] It appears from the record that Agent Flood may have intended to state the value of the marijuana was $185,000.

is interviewed and admits ownership of three of the bags but denies knowledge of the marijuana and the total weight of the marijuana is 193 pounds. [¶] Hypothetically, in your expert opinion, would this hypothetical person have knowledge of the marijuana?"

Agent Flood responded in the affirmative and added, "Based on the way it is packaged, hidden in the vehicle, matching bags that he is saying are his but the ones with the marijuana aren't. More so just the value. [¶] The idea of putting $180,000 in someone's car and just hope that it is going to reach its destination is, especially in the drug world, unthinkable."

III.

DISCUSSION

A. *The trial court erred in admitting Agent Flood's testimony concerning the structure and practices of drug trafficking organizations*

Covarrubias contends that the trial court erred in admitting Agent Flood's testimony concerning the structure and practices of drug trafficking organizations. Covarrubias contends that this testimony was inadmissible pursuant to Evidence Code section 352.[9] We review the trial court's ruling for an abuse of discretion. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321] [abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence and is particularly appropriate for questions concerning undue prejudice].)[10]

1. *Governing law*

a. *Relevant statutory law*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

---

[9] Covarrubias also contends that Agent Flood's testimony concerning the structure and practices of drug trafficking organizations was inadmissible because it was irrelevant. In light of our conclusion that the trial court abused its discretion in failing to exclude the evidence pursuant to Evidence Code section 352, we need not address this contention.

[10] We assume for purposes of this opinion that Covarrubias's motion in limine adequately preserved the objections to Agent Flood's testimony that he raises on appeal.

b. *Relevant case law*

In *U.S. v. Vallejo* (9th Cir. 2001) 237 F.3d 1008 (*Vallejo*), opinion amended (2001) 246 F.3d 1150, the United States Court of Appeals for the Ninth Circuit considered the admissibility of expert testimony concerning the structure and practices of drug trafficking organizations under the Federal Rules of Evidence (28 U.S.C.)[11] pertaining to relevance (rule 401) and undue prejudice (rule 403).[12] In *Vallejo*, the defendant was stopped in his car as he attempted to enter the United States from Mexico. (*Vallejo, supra,* at p. 1012.) An inspector discovered several packages of marijuana concealed in the car. The marijuana weighed approximately 40 kilograms.[13] (*Id.* at p. 1013.) The United States (Government) charged Vallejo with importation of marijuana and possession of marijuana with the intent to distribute. (*Id.* at p. 1012.) Although the Government did not charge Vallejo with conspiracy to import drugs and did not introduce any evidence establishing a connection between Vallejo and any drug trafficking organization, the district court permitted the Government to present the following expert testimony: "Expert testimony regarding the structure of drug trafficking organizations and the wages earned by drug couriers was also permitted at trial. Customs Agent Gordon Ajioka testified about how drug trafficking organizations divide responsibilities among the people who grow, store, smuggle, and sell drugs. He also testified about the price at which marijuana can be sold in Mexico, its higher price in the United States, and the reasons for the discrepancy between the two. Later, during its rebuttal case, the Government called Customs Agent Louie Garcia to testify regarding the amount of money couriers are paid to smuggle drugs into the United States from Mexico. The Government introduced this testimony to explain its theory of why Vallejo was found with a business card, the writing on which identified a Honda—like the car he was driving and stated a dollar amount of $700–800. The government believed the card identified the car to be used for drug importation and the price Vallejo would be paid. Vallejo, on the other hand, testified that the card identified a car he wanted to buy and its price." (*Id.* at pp. 1013–1014.)

After concluding that the Government had failed to articulate how testimony concerning "the structure of drug trafficking organizations" was relevant to the case, the *Vallejo* court concluded that if the Government had

---

[11] Further rule references are to the Federal Rules of Evidence.

[12] Former rule 401 provided, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Former rule 403 provided, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[13] Forty kilograms is approximately 88 pounds.

"asserted that it introduced the evidence to show Vallejo's knowledge . . . the district court should properly have excluded it under Rule 403 of the Federal Rules of Evidence." (*Vallejo, supra*, 237 F.3d at p. 1016.) In reaching this conclusion, the *Vallejo* court reasoned:

"We have allowed 'government agents or similar persons [to] testify as to the general practices of criminals to establish the defendants' modus operandi.' *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir.1984). Such testimony helps the trier of fact to understand how 'combinations of seemingly innocuous events may indicate criminal behavior.' *Id.*; *see United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir.1995) (allowing 'expert testimony that drug traffickers often employ counter-surveillance driving techniques, register cars in others' names, make narcotics and cash deliveries in public parking lots, and frequently use pagers and public telephones' to establish defendants' modus operandi in the face of a Rule 403 challenge); *United States v. Maher*, 645 F.2d 780, 783 (9th Cir.1981) (allowing expert testimony that 'Maher's activities were similar to the modus operandi of persons conducting countersurveillance while transporting drugs'). We have also allowed testimony about how criminal narcotics distribution organizations operate to help the jury understand a complex heroin distribution scheme involving twenty to twenty-five members of a structured criminal enterprise. *United States v. Patterson*, 819 F.2d 1495, 1507 (9th Cir.1987); *see also United States v. Cordoba*, 104 F.3d 225, 230 (9th Cir.1997) ('[The expert] testimony was properly admitted to assist the jury in understanding modus operandi in a complex criminal case.').

"Agent Ajioka's testimony concerning the structure and modus operandi of drug trafficking organizations was not relevant to the Government's case against Vallejo. Nor was it needed to assist the jury's understanding of a complex criminal case. Agent Ajioka testified to the different roles played by various members of drug trafficking organizations, and although he did not cast Vallejo in a particular role, the implication of his testimony was that Vallejo had knowledge of how the entire organization operated, and thus knew he was carrying the drugs. To admit this testimony on the issue of knowledge, the only issue in the case, was unfairly prejudicial, and an abuse of discretion under Rule 403." (*Id.* at pp. 1016–1017.)

■  The *Vallejo* court supported its conclusion by noting that "[t]he improper use of testimony concerning the structure of drug trafficking organizations in this case is akin to the improper use of drug courier profiles. A drug courier profile is 'a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics.' [Citation.]"

(*Vallejo, supra*, 237 F.3d at p. 1017.)[14] The *Vallejo* court observed that profile evidence is inadmissible as substantive proof of a defendant's guilt, "[b]ecause ' "[e]very defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity." ' " (237 F.3d at p. 1017.)

■ The Ninth Circuit has applied *Vallejo* on numerous occasions in concluding that expert testimony concerning the structure and practices of drug trafficking organizations is inadmissible in cases in which no evidence is presented that establishes an association between the defendant and such an organization. (See, e.g., *U.S. v. McGowan* (9th Cir. 2001) 274 F.3d 1251, 1254 ["The admission of the expert testimony in this case was improper under *Vallejo* . . . ."]; *U.S. v. Varela-Rivera* (9th Cir. 2002) 279 F.3d 1174, 1179 [applying *Vallejo* and concluding "Agent Wooley's testimony about the structure and methods of drug trafficking organizations and the fees paid to couriers within those organizations should have been excluded . . . ."]; *U.S. v. Pineda-Torres* (9th Cir. 2002) 287 F.3d 860, 865 (*Pineda-Torres*).) The *Pineda-Torres* court explained: "In *Vallejo*, we compared the admission of expert testimony about the structure of drug trafficking organizations to the improper use of drug courier profiles and held that the district court abused its discretion when it admitted expert testimony about the structure and operation of drug trafficking organizations in a simple border bust case. [Citation.]" (*Id.* at p. 864.)

With respect to its conclusion that expert testimony discussing drug trafficking organizations is unduly prejudicial in a case in which there is no evidence associating the defendant with such an organization, the *Pineda-Torres* court stated: "[A]n expert providing testimony about the structure of drug trafficking organizations attributes knowledge to the defendant by attempting to connect him to an international drug conspiracy and thus implies that the defendant 'participated in a large-scale operation.' [Citation.] There is no direct evidence associating the defendant with a drug trafficking organization so the expert uses the 'blueprint' structure of international drug trafficking organizations as a means of doing so. Because 'criminal prosecutions cannot be blueprinted, but must be tailored to the charges and facts of

---

[14] California courts have relied on Ninth Circuit case law in holding that criminal profile evidence is inadmissible. (See *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084 [112 Cal.Rptr.2d 479] [citing *U.S. v. Beltran-Rios* (9th Cir. 1989) 878 F.2d 1208, 1210 (*Beltran-Rios*) and concluding that "[p]rofile evidence is generally inadmissible to prove guilt"]; *People v. Martinez* (1992) 10 Cal.App.4th 1001, 1006 [12 Cal.Rptr.2d 838] (*Martinez*) [citing *Beltran-Rios* and concluding evidence that defendant fit profile of a driver for an auto theft ring was inadmissible because "[w]hile the similarities may be a proper consideration for law enforcement in investigating criminal activity, they are inappropriate for consideration on the issue of guilt or innocence for the very reason given in the drug courier profile cases: the potential of including innocent people as well as the guilty"].)

each case in consideration of the individual rights of each defendant,' this method of imputing knowledge lacks any probative value and is impermissible. [Citation.]" (*Pineda-Torres, supra,* 287 F.3d at p. 865.)

## 2. *Application*

Neither party has cited, nor has our independent research uncovered, any California authority addressing *Vallejo* or its progeny. However, the reasoning of such cases in applying rule 403, "the federal equivalent of [Evidence Code] section 352" (*People v. Falsetta* (1999) 21 Cal.4th 903, 921 [89 Cal.Rptr.2d 847, 986 P.2d 182]), is directly on point, consistent with California law, and persuasive.[15]

In this case, Agent Flood provided lengthy testimony concerning the structure and practices of drug trafficking organizations, including a description of the various roles that individuals perform within such organizations. (See pt. II.B.3., *ante.*) Because the People presented no evidence associating Covarrubias with such an organization, the trial court abused its discretion in admitting this evidence pursuant to Evidence Code section 352. (See *Vallejo, supra,* 237 F.3d at p. 1017.) Agent Flood also provided an " ' "informal compilation of characteristics often displayed by those trafficking in drugs." ' " (*Martinez, supra,* 10 Cal.App.4th at p. 1006, fn. 2, citations omitted.) Specifically, his extensive testimony concerning the characteristics of drug smugglers and their behavior included the times of day when a person would be more likely to attempt to smuggle drugs across the border, the types of vehicles that a smuggler might use, and the likelihood that a smuggler would be carrying a cellular phone. (See pt. II.B.3., *ante.*) This testimony constituted criminal profile evidence, which also is inadmissible under the reasoning of *Vallejo* (*Vallejo, supra,* 237 F.3d at p. 1017), as well as under California law (*Martinez, supra,* 10 Cal.App.4th at p. 1006).

The People's attempt to distinguish *Vallejo* is not persuasive. The People contend that *Vallejo* can be distinguished on the ground that the Government in that case failed to argue that expert testimony concerning a drug trafficking organization may be relevant to show a defendant's knowledge of the presence of drugs. We reject that argument because the Ninth Circuit has expressly held that the rationale of *Vallejo* applies in cases in which the prosecution asserts that such expert testimony is relevant to prove knowledge: "In Pineda-Torres's case, as in *Vallejo,* the state did not articulate a theory of relevance for the drug structure testimony at the trial. [Citation.] On appeal in

---

[15] Our reliance on Ninth Circuit case law that applies the federal equivalent of Evidence Code section 352 is particularly appropriate given that defendants may be charged with importation and transportation of marijuana in either state or federal court. In this case, Agent Martinez testified that a "state case" is "a marijuana case under 200 pounds."

this case, however, the government argued that the purpose of the expert testimony was to show that Pineda-Torres knew that drugs were in the car. We explicitly rejected that reason for offering drug structure evidence in *Vallejo* when we stated that 'had that been the [government's] purpose, the district court should properly have excluded it under Rule 403 of the Federal Rules of Evidence.' [Citation.] To the extent that the *Vallejo* statement may be dictum, we adopt it as a holding here." (*Pineda-Torres, supra*, 287 F.3d at p. 864.)

The People also contend that we may uphold the admission of Agent Flood's testimony concerning the structure and practices of drug trafficking organizations pursuant to the rationale of *U.S. v. Sepulveda-Barraza* (9th Cir. 2011) 645 F.3d 1066, 1070 (*Sepulveda-Barraza*) and *U.S. v. Murillo* (9th Cir. 2001) 255 F.3d 1169 (*Murillo*), overruled on other grounds by *Muehler v. Mena* (2005) 544 U.S. 93 [161 L.Ed.2d 299, 125 S.Ct. 1465]. We are not persuaded. To begin with, *Sepulveda-Barraza* and *Murillo* both distinguished *Vallejo* on the ground that the defendant in each case had opened the door to such testimony. (*Sepulveda-Barraza, supra*, at p. 1068 [defendant opened the door by providing notice that he intended to call an expert witness to testify that drug trafficking organizations sometimes utilize unknowing couriers to smuggle drugs across the border]; *Murillo, supra*, at p. 1177 [defendant opened the door to People's expert testimony by designating a fingerprint expert to testify as to the lack of fingerprints on drugs].) In this case, in contrast, in his motion in limine, Covarrubias expressly offered "not to raise the lack of fingerprint evidence" and he did not designate any experts prior to trial. Covarrubias thus cannot be said to have "opened the door" (*Sepulveda-Barraza, supra*, at p. 1068) to Agent Flood's testimony.

In addition, the scope of the expert testimony presented in *Sepulveda-Barraza* and *Murillo* was far narrower than in this case. In both *Sepulveda-Barraza* and *Murillo*, the Government did not "insinuate that [the defendant] was connected to a large drug trafficking organization; . . . 'did not extrapolate the various roles individuals might play in hypothetical drug trafficking organizations, nor did [the testifying agent] imply that [the defendant] participated in a large-scale operation.' *Murillo*, [*supra*,] 255 F.3d at [p.] 1177." (*Sepulveda-Barraza, supra*, 645 F.3d at pp. 1072–1073.)

In this case, Agent Flood *did* insinuate that Covarrubias was connected to a large drug trafficking organization (e.g., by testifying that drivers are "very important" to drug trafficking organizations and that such organizations could not function without "transporters"); *did* discuss the roles that different individuals play in such organizations ("Drug trafficking organization has a variety of different jobs. You have got basically the people that grow the marijuana, the people that package it after [it has] been chopped down . . .

and the people that are actually involved in the actual drug trafficking"); and *did* imply that Covarrubias participated in a large-scale operation ("[t]he idea of putting $180,000 in someone's car and just hope that it is going to reach its destination is, especially in the drug world, unthinkable"). In addition, in *Sepulveda-Barraza*, the Ninth Circuit upheld the admissibility of expert testimony "touch[ing] *on*" (*Sepulveda-Barraza, supra*, 645 F.3d at p. 1072, italics added) the structure and operations of drug trafficking organizations because the testimony provided the "foundation" for the expert's opinion that drug trafficking organizations do not normally use unknowing couriers (*ibid.* ["To the extent Bortfeld's testimony regarding his background and experience investigating drug trafficking organizations touched on the structure and operations of drug trafficking organizations, it was also relevant to establish that his expert opinion 'rests on a reliable foundation and is relevant to the task at hand.' [Citation.]"]). In contrast, in this case, Agent Flood's lengthy testimony did far more than "touch[] on" (*ibid.*) the structure and operations of drug trafficking organizations. Rather, this was the *focus* of his testimony, and not merely the foundation for other testimony.[16]

We also reject the People's contention that expert testimony concerning "the functioning of drug trafficking organizations" was admissible pursuant to *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1556 [26 Cal.Rptr.2d 741] (*Lopez*) and *People v. Harvey* (1991) 233 Cal.App.3d 1206, 1221 [285 Cal.Rptr. 158] (*Harvey*). *Lopez* and *Harvey* are wholly distinguishable because in each of those cases, the defendant was charged with *conspiracy* to manufacture or distribute narcotics (*Lopez, supra*, at p. 1554; *Harvey, supra*, at p. 1219) and the People presented evidence linking the defendant to a drug trafficking organization (*Lopez, supra*, at p. 1556 ["In the present case, the testimony served only as background information that allowed the jury to understand the complex cast of characters and events that comprised this months-long conspiracy."]; *Harvey, supra*, at p. 1229 ["[W]e find no error in the trial court's admission of Agent Cid's expert testimony regarding the significance of various activities and the role of each defendant in the hierarchy of a Colombian cocaine distribution cell."]).

█ In this case, in contrast, Covarrubias was not charged with conspiracy. The People therefore were not required to demonstrate Covarrubias's role in a drug trafficking organization, and presented no actual evidence demonstrating such a role. In fact, this is the fundamental distinction upon which *Vallejo* and

---

[16] In both *Sepulveda-Barraza* and *Murillo*, the Ninth Circuit upheld the admissibility of testimony concerning "unknowing couriers" or " 'blind mules' " (*Sepulveda-Barraza, supra*, 645 F.3d at p. 1068), " 'in which a law enforcement official testifies that certain drug traffickers do not entrust large quantities of drugs to unknowing transporters,' " in light of the particular factual circumstances presented in those cases. (*Id.* at p. 1070; see *Murillo, supra*, 255 F.3d at pp. 1176–1178.) We need not, and do not, address the admissibility of such testimony under California law in this case. (See fn. 17, *post*.)

its progeny rest: "We consider whether expert testimony detailing the structure of drug trafficking organizations may be routinely introduced in drug importation cases, regardless of whether the defendant is charged with a drug trafficking conspiracy or otherwise charged with membership in such an organization. Applying traditional evidentiary principles, we hold that expert testimony regarding the general structure and operations of drug trafficking organizations is inadmissible where the defendant is not charged with a conspiracy to import drugs or where such evidence is not otherwise probative of a matter properly before the court." (*Vallejo, supra*, 237 F.3d at p. 1012.)

Accordingly, we conclude that the trial court erred in admitting Agent Flood's testimony concerning the structure and practices of drug trafficking organizations.[17]

B.  *Any error committed by the trial court in failing to exclude Agent Flood's testimony in its entirety was harmless*

We held in part III.A., *ante*, that the trial court erred in admitting Agent Flood's testimony concerning the structure and practices of drug trafficking organizations. In this part, we assume that the trial court erred in failing to exclude Agent Flood's testimony in its entirety, and consider whether this error was prejudicial.

1.  *The admission of Agent Flood's testimony did not violate Covarrubias's right to due process by rendering the trial fundamentally unfair*

Covarrubias contends that the admission of Agent Flood's testimony violated his constitutional right to due process,[18] and thus, that the *Chapman* standard of prejudice applies. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) We disagree that the admission of Agent Flood's testimony constituted a due process violation.

---

[17] Covarrubias also contends that Agent Flood's testimony with respect to "blind mules" and the value of the marijuana was inadmissible, and maintains that Agent Flood impermissibly testified as to Covarrubias's subjective mental state. We do not consider these contentions in light of our conclusion in part III.B., *post*, that any error in failing to exclude Agent Flood's testimony *in its entirety* was harmless.

[18] The People concede that Covarrubias may raise the "due process argument" that the trial court's failure to exclude Agent Flood's testimony "over his Evidence Code section 352 objection had the additional legal consequence of violating due process," notwithstanding that Covarrubias did not articulate a constitutional basis for excluding the evidence at trial. (Quoting *People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*).)

■ "Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair." (*People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042 [5 Cal.Rptr.3d 542]; see *Partida, supra*, 37 Cal.4th at p. 436 ["[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair."].) For example, even the improper admission of evidence of uncharged crimes committed by the defendant does not ordinarily amount to constitutional error. (See *People v. Felix* (1993) 14 Cal.App.4th 997, 1007–1008 [18 Cal.Rptr.2d 113].)

"To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 [57 Cal.Rptr.3d 92].) " 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*Id.* at pp. 229–230.)

While Agent Flood's expert testimony concerning drug trafficking and drug trafficking organizations constituted a significant portion of the prosecution's case-in-chief, it was far from the primary evidence of Covarrubias's guilt. As the prosecutor stated during closing argument: "The purpose of Agent Flood's testimony was to explain how these drug trafficking organizations work. But it bears repeating that we had much more than defense counsel argued to you. We had much more than merely the fact that no one could put money on a strange truck and hope it gets to its destination. [¶] We had several other things. We had the fact that it was his truck, the fact that it was his roofing shingles, his behavior during the interview, his behavior at the border, his inconsistent statements as to where he was going and the expert testimony . . . ."

Having reviewed the entire record of the trial, we agree that the People's case against Covarrubias was based primarily on evidence *other* than Agent Flood's testimony. Indeed, as we discuss in part III.B.2., *post*, the inconsistent, illogical, and inculpatory statements that Covarrubias made during his interrogation at the border constituted strong evidence of his guilt. We therefore reject Covarrubias's contention that "[t]he trial focused on the authority and experience of a government agent, rather than the specific facts of the appellant's conduct."

In addition, while Covarrubias contends that Agent Flood's testimony "introduced the unproven assumption that appellant was part of a drug trafficking organization," the jury could have reasonably drawn such an inference from the other evidence in the case. Specifically, the jury could

have reasonably drawn this inference from the fact that Covarrubias had a large quantity of marijuana in his possession, and also from the inconsistent statements that he made to law enforcement agents. Agent Flood's testimony, in large part, merely corroborated a reasonable inference that the jurors likely would have drawn without such testimony.[19]

Finally, while the admission of Agent Flood's testimony concerning the organizational structure and practices of drug trafficking organizations was improper, for the reasons stated in part III.A., *ante*, his testimony largely portrayed such an organization as operating a business, rather than as a criminal organization committing violent acts. Thus, the testimony was not so "uniquely inflammatory" as to render the trial fundamentally unfair. (*People v. Albarran, supra*, 149 Cal.App.4th at pp. 230–232 [trial court's admission of "extremely and uniquely inflammatory" gang evidence including evidence concerning a "threat to police officers, . . . Mexican Mafia evidence and evidence identifying other gang members and their unrelated crimes," which "had no legitimate purpose" constituted one of the "rare and unusual occasions" where the admission of evidence rendered the defendant's trial fundamentally unfair].)[20]

Accordingly, we conclude that the admission of Agent Flood's testimony did not rise to the level of a constitutional due process violation.

> 2. *It is not reasonably probable that the verdicts would have been more favorable to Covarrubias if the trial court had excluded Agent Flood's testimony*

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson*[21] test: The reviewing court must ask whether it is reasonably probable the verdict[s] would have been more favorable to the defendant absent the error. [Citations.]" (*Partida, supra*, 37 Cal.4th at p. 439.)

---

[19] In arguing that Agent Flood's testimony did not constitute proper expert testimony because it did not "add to the jury's own decision making capacity," Covarrubias states in his brief, "Flood's opinions added nothing to the jury's common sense regarding appellant's state of mind."

[20] In this regard, we note that the trial court did "order that there not be any reference to gangs" in Agent Flood's testimony.

[21] *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243].

As noted above, Agent Flood's testimony was a significant part of the prosecution's case in that his testimony was relatively lengthy,[22] and the prosecutor referred to Agent Flood's testimony several times during closing argument in urging the jury to find Covarrubias guilty of the charged crimes. In a close case, we might well conclude that the erroneous admission of such testimony constituted reversible error. However, this was not a close case.

Covarrubias had seven bags of roofing shingles in his truck. Each bag had been opened and resealed with clear tape. Along with shingles, the bags contained approximately 193 pounds of marijuana.[23] Covarrubias admitted that he owned the truck in which the marijuana was found, that he had purchased the truck approximately four to five months earlier, and that he had not lent the truck to anyone.

Further, Covarrubias was inconsistent with respect to the critical issue of whether he owned the bags of shingles. He initially told Agent Martinez that he did not know who owned the shingles. He then admitted that he owned three of the seven bags. Given Agent Morey's testimony that all of the bags of shingles were "identical," Covarrubias's admission that he owned three of the bags strongly suggested that he knew that marijuana was located in the bags. To conclude otherwise would require the jury to believe that a person had surreptitiously placed four bags of roofing shingles on Covarrubias's truck, that these four bags were identical to the three bags that Covarrubias admitted he owned, and that this person had inserted bundles of marijuana into the bags.

In addition, Covarrubias's claim that he had purchased the shingles for a roofing job in Encanto, which he was planning to go to later that day, was implausible since he was unable to provide either the name of the person who had hired him or the location of the jobsite, and he admitted that he was uncertain whether he was in fact going to perform the job. Finally, Covarrubias's statement upon being told of the discovery of the marijuana, i.e., that he "ignored it," suggests that he knew that there was marijuana in his truck. In sum, Covarrubias made a number of illogical, inconsistent, and inculpatory statements to Agent Martinez that strongly suggested that he knew there was marijuana in his truck.

We reject Covarrubias's contention that the admission of Agent Flood's testimony was prejudicial in light of the weakness of the prosecution's case.

---

[22] Agent Flood's direct testimony comprises approximately 29 pages of the reporter's transcript. In comparison, the direct testimony of Agent Martinez and Agent Morey, the People's primary percipient witnesses, comprised a total of approximately 53 pages.

[23] As noted previously (see fn. 6, *ante*), it appears from the record that marijuana was hidden in each of the seven bags.

Specifically, we reject Covarrubias's claim that the prosecution's failure to present evidence tending to connect him to a drug trafficking organization and the prosecution's failure to conduct an "investigation to discredit the explanation [Covarrubias] gave when arrested" demonstrates the prejudicial effect of Agent Flood's testimony. As discussed above, Covarrubias's statements during the interrogation were both facially implausible and inculpatory. The purported deficiencies in the People's case thus did not render it reasonably probable that the verdicts would have been more favorable to Covarrubias if the trial court had excluded Agent Flood's testimony.

Accordingly, we conclude that any error in admitting Agent Flood's testimony was harmless.

## IV.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 21, 2012, S199233.