Filed 5/31/13  P. v. Jiang CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>YONGTAO JIANG,<br><br>        Defendant and Appellant. | A132083<br><br>(Contra Costa County<br>Super. Ct. No. 5-100203-09) |

Defendant Yongtao Jiang was found living in part of a "grow house," a residence devoted to the cultivation of marijuana.  He claimed he did not know about the cultivation operation or that marijuana was present in the house.  The jury rejected this defense and convicted him of possession of marijuana for sale (Health & Saf. Code, § 11359), and cultivation of marijuana (Health & Saf. Code, § 11358).  The trial court sentenced defendant to three years' felony probation conditioned on serving 365 days in jail.  He contends the trial court erred by admitting an expert opinion that anyone on the premises of a grow house is involved in the unlawful cultivation activities, and that the trial court denied him his constitutional right to present a defense, i.e., third party culpability.  We disagree and affirm.

## I.  FACTS

On September 10, 2009, several police officers executed a search warrant on a residence at 1619 Ohio Street in Richmond.  The windows of the house were covered in blue steel security screens and a locked gate barred entry to the property.  The officers had to force entry into the house.  As they were about to enter, they saw defendant run

out of the house through a side door, and run toward the backyard. The officers arrested him.

The house contained a large marijuana cultivation operation with a total of 1,416 plants, which could produce a yearly harvest worth at least $200,000 to $600,000. There were ballast systems, designed to amplify electrical output for grow lights, and a ventilation system commonly used by indoor growers to conceal the marijuana odor from neighbors and to reduce the "heat signature."[1] A bypass device had been installed on the house's PG&E meter. According to expert testimony, indoor marijuana cultivation uses a great deal of power for grow lights, so growers use a bypass device to prevent the PG&E meter from reading the true amount of electricity used.

Just inside the front door was a living area with a sleeping bag and a couch. Apparently, there were no marijuana plants in this living area. Down the hall from this living area was an open kitchen—not barred by a locked door—containing 176 marijuana plants in grow trays and a system of eight ceiling lights. There was a bathroom off the hallway near the kitchen. A watering system was set up in the bathroom, including a hose in plain view connected to the sink.

In the living room at the rear of the house, the officers found 198 marijuana plants, nine grow lights, a charcoal filter, and watering trays. In the dining room, they found 132 plants, grow trays, another filter, and six grow lights. In the four upstairs bedrooms, the officers found a total of approximately 375 marijuana plants, 22 grow lights, 15 ballasts, and 9 trays.

There were items related to cultivation, including ballasts and a supply of plant nutrients, in the hallways of the home. Only one of the rooms containing marijuana plants was locked. The officers did find a false room hidden behind a wall, containing four grow lights, four grow trays, and approximately 95 plants. There were also 441

---

[1] A "heat signature" is a significant amount of heat which can be detected by a thermal imaging device. (See *U.S. v. Cusumano* (10th Cir. 1995) 67 F.3d 1497, 1499–1501, vacated on other grounds in *U.S. v. Cusumano* (10th Cir. 1996) 83 F.3d 1247.)

plants in the garage, along with six grow trays, four grow lights, a charcoal filter, and a separate room containing a crop of "clones," very young marijuana plants.

San Pablo Police Officer William Zink, a member of the West Contra Costa County Narcotics Task Force, qualified as an expert in the cultivation, sale, possession for sale, and use of marijuana. He testified that marijuana was being cultivated at the house for the purposes of sale. Officer Nick Voyvodich interviewed defendant, who told him he was being paid $5,000 per month in cash to watch the house and the plants.

Defendant testified at trial.[2] He believed Kwong Wing Cheng, who had been his codefendant in this case, owned the Ohio Street house. The parties stipulated, in the jury's presence, that Cheng had pleaded guilty to possession of marijuana for sale at that residence.

Defendant was from China and had been in this country approximately nine years. A friend of his, Kueng Ling Fang, told him about a job house sitting in Richmond that paid $5,000 a month. Defendant thought the owner wanted a house sitter because Richmond was not safe. Fang took him to the Ohio Street house and showed him only the front living area, the upstairs bathroom, the front and back yards, and the exterior walkways. Defendant could not see into any other rooms of the house.

Defendant took the job and stayed at the house approximately four nights a week. He was told he could only be in the front living area and the upstairs bathroom, and could not look into any other rooms. He asked no questions, because in the Chinese culture one shows deference and respect to one's employer and does not ask questions about what is in another's home. Defendant smelled unusual odors, but did not ask about them because he felt it was a "family matter."

---

[2] "We generally relate[d] defendant's testimony without repeated qualifiers such as 'Defendant testified that' or 'According to defendant.' It must be understood that what may appear to be unqualified statements of fact are defendant's version of events, which must be viewed in light of the jury's [guilty] verdict[s]." (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1134, fn. 4.)

By the time the police officers executed the search warrant, defendant had been house sitting for about six months. During that time, he had never seen any marijuana in the house. He had never gone to any other area of the house other than the front living area and the upstairs bathroom. He never noticed any ballasts and did not know what a ballast was. He was never asked to care for the marijuana plants. He denied telling Officer Voyvodich he was caring for the plants.[3] He fled the house when the police officers banged on the front door because he thought the house was being robbed. To get to the side door as he fled, he had to force open the locked door to the rear living room.

Officer Voyvodich testified for the defense, indicating that there were no plants in the front living area and plants were not visible from the front living area. On cross-examination, he testified that a grow tray, four ballasts, and wiring were located in the hallway by the upstairs bathroom. He also testified there was no sign of any door being forced open; from the upstairs bathroom one could see into the adjacent room and see marijuana plants, grow lights, and grow trays; and a grow tray, four or more ballasts, and wiring were in plain sight in the hallway and landing at the top of the stairs.

## II. DISCUSSION

Defendant first contends the trial court erred by admitting an expert opinion that anyone on the premises of a grow house is involved in the unlawful cultivation activities. Officer Zink, the marijuana cultivation expert, testified over defense counsel's objection as follows:

"Q. [BY THE PROSECUTOR]: In your experience, [Officer] Zink, is it uncommon for persons involved in the commercial indoor growing of marijuana to work together with other people to—basically to cultivate?

"A. [OFFICER ZINK]: Generally grow[er]s have helpers, yes.

---

[3] Both Voyvodich and defendant testified the interview was largely the former asking questions to which the latter gave yes-or-no answers. Defendant, who had taken English as a second language courses and spoke and understood English "fairly well," had difficulty understanding Voyvodich because the officer spoke rapidly. The interview was not recorded and Voyvodich took no contemporaneous notes, preparing his written report the following day.

4

"Q. And you mentioned some of the issues relating to security concerning indoor grows and you said that [a] couple of factors were detection by law enforcement and then also not wanting to get robbed; is that correct?

"A. Correct.

"Q. Based on your experience in terms of the grows you've been to, talking to people involved in these operations, your own investigations, talking to other officers, and generally your experience in this field, persons who are involved in this activity, *do you have an opinion as to whether they would share access of the location, the grow location, with people not involved in the grow?* [Italics added.]

[Defense counsel's objection overruled.]

"[OFFICER ZINK]: *No, they would not.* [Italics added.]

"Q. Okay. And why is that?

"A. Because, again, you increase your detection by bringing people in who are not involved in the growing operation.

"Q. And by doing so, if you were to do that, what would happen or what would be the concern about being detected?

"A. Well, the same—you would have the same threats as you would—detection by law enforcement and also that person telling someone else. There is a large grow here, there is marijuana here. And, again, you increase your chance of being robbed."

Defendant contends it was error to allow into evidence Officer Zink's opinion which he characterizes as "anyone on the premises of a grow house is involved in the unlawful cultivation." We disagree.

Defendant relies primarily on *People v. Covarrubias* (2011) 202 Cal.App.4th 1 (*Covarrubias*). The defendant in that case was caught driving into the United States from Mexico in his truck, with 193 pounds of marijuana hidden among roofing shingles. He claimed he was coming into the country to look for roofing work. While not denying knowledge of the marijuana outright, he claimed he " ' "ignored it" ' " and made "inconsistent, illogical, and inculpatory statements" during his interrogation at the border. (*Id.* at pp. 9, 20.)

5

Apparently, the defendant's knowledge of the marijuana was an issue at trial. An expert was permitted to testify for the prosecution about the structure and practices of drug trafficking organizations. (*Covarrubias, supra,* 202 Cal.App.4th at pp. 10–11.) The court held it was error to admit that evidence in the absence of a conspiracy charge, because the expert improperly insinuated the defendant was connected to a large drug trafficking organization and the testimony amounted to improper criminal profile evidence. (*Id.* at pp. 12, 16–19.) *Covarrubias* relied on two Ninth Circuit cases which likewise ruled inadmissible, in the absence of a charge of conspiracy, evidence of the structure and practice of drug trafficking organizations, because such evidence implied the defendant was connected to a large drug trafficking operation, imputed knowledge to the defendant of the controlled substance found in his possession, and was akin to improper profiling evidence. (*Id.* at pp. 13–16; see *U. S. v. Pineda-Torres* (9th Cir. 2002) 287 F.3d 860, 863–866 (*Pineda-Torres*); *U. S. v. Vallejo* (9th Cir. 2001) 237 F.3d 1008, 1015–1017 (*Vallejo*).)

*Covarrubias*, *Pineda-Torres*, and *Vallejo* are distinguishable because Officer Zink did not testify regarding the structure and practice of drug trafficking organizations. Rather, his expert testimony at issue is simply his opinion that generally persons involved in marijuana grow operations do not share access to the grow location with people not involved in the grow. Defendant's denial of involvement in and knowledge of the marijuana cultivation makes this a variant of a "blind mule" case.

A "blind mule," according to the expert witness in *Covarrubias*, is a drug courier who does not know he is carrying drugs—a "mule" being a drug courier. (*Covarrubias*, *supra*, 202 Cal.App.4th at p. 6.) The expert believed a "blind mule" is "fictional." (*Id.* at p. 11.) In his opinion, there are "numerous reasons why a drug trafficking organization would not use a blind mule, including that the organization would not know where the transporter was going and that the organization would be unable to retrieve the drugs once the blind mule had taken the drugs across the border." (*Ibid.*)

Defendant was not transporting drugs, but taking care of marijuana plants under cultivation. He essentially raised a "blind caretaker" defense, i.e., he was only taking

6

care of the house and did not know of the cultivation operation or of the presence of marijuana. Officer Zink's opinion testimony was meant to counter that defense, based on the officer's experience with marijuana growth operations. We see no error in the admission of his expert opinion.

*Covarrubias* did not reach the issue of the admissibility of the "blind mule" testimony in that case. (*Covarrubias, supra,* 202 Cal.App.4th at p. 19, fn. 17.) In a modification of its original opinion on denial of rehearing, the *Vallejo* court, likewise, did not reach the issue. (*U.S. v. Vallejo* (9th Cir. 2001) 246 F.3d 1150 [adding a footnote clarifying the court did not address the issue of admissibility of "unknowing courier" testimony, "in which a law enforcement official testifies that certain drug traffickers do not entrust large quantities of drugs to unknowing transporters."].)

*Pineda-Torres* distinguished testimony about the structure and practice of drug trafficking organizations from "unknowing courier" testimony, citing three Ninth Circuit cases which find the latter testimony admissible, at least in a complex case or a case involving drugs worth a considerable sum. (*Pineda-Torres, supra,* 287 F.3d at pp. 864–865.) For instance, in *U.S. v. Murillo* (9th Cir. 2001) 255 F.3d 1169 (*Murillo*) the court ruled "unknowing courier" testimony was admissible and did not imply the defendant was a member of a large-scale operation. (*Murillo, supra,* at pp. 1177–1178.) *Pineda-Torres* reasoned an expert presenting such testimony "looks at the specific facts involved and, in light of his investigative experience, offers his opinion that it would be illogical and contrary to general practice for a drug trafficker to take the very risky step of entrusting his valuable cargo to an unknown courier." (*Pineda-Torres, supra,* at p. 865.) "Unknowing courier" testimony was also held admissible in *U.S. v. Sepulveda-Barraza* (9th Cir. 2011) 645 F.3d 1066, 1071–1072.

We are cited to no California authority rendering "unknowing courier" evidence inadmissible. Based on the Ninth Circuit decisions allowing its admission, and drawing the analogy between the "blind mule" and the "blind caretaker" we have discussed above, we conclude the admission of Officer Zink's testimony was not error. This was clearly a complex, sophisticated growing operation yielding hundreds of thousands of dollars of

7

annual profit. Defendant was paid $5,000 a month, an uncommonly handsome sum for a house sitter, to watch over it. The officer's expert opinion was clearly admissible, relevant, and probative.[4]

Second, defendant contends the trial court denied him his constitutional right to present the defense of third party culpability. A defendant has the right to introduce evidence a third party committed the charged crime, even if the prosecution's case is strong, if the evidence raises a reasonable doubt of defendant's guilt. (See *Holmes v. South Carolina* (2006) 547 U.S. 319, 330–331; *People v. Abilez* (2007) 41 Cal.4th 472, 517 (*Abilez*).) We conclude defendant was not prevented from presenting the defense of third party culpability.

Defendant testified he was innocent of any knowledge of the cultivation operation and the presence of marijuana in the grow house, and he was only hired to watch over the residence and was limited to a small portion of its space. He was also permitted to place before the jury the stipulation that Cheng had pleaded guilty to possession of marijuana for sale at the Ohio Street residence. This sufficiently raised the defense that it was Cheng, and not defendant, who was responsible for the grow operation.

But defendant wanted to introduce additional evidence of Cheng's culpability: 100 marijuana plants, keys to and a PG&E bill for the Ohio Street residence, almost $28,000 in cash, and cultivation tools, all seized from Cheng by the California Highway Patrol during a traffic stop.

---

[4] As such, we need not reach defendant's argument that the improper admission of the testimony deprived him of due process of law.

In his offer of proof regarding this evidence, defendant stressed his defense of lack of knowledge of the cultivation operation and the presence of marijuana. He also stated he would testify he did not tell Officer Voyvodich he was paid to watch the plants, but only the house.[5]

The trial court correctly concluded that evidence of Cheng's culpability would not exculpate defendant because he was present in the grow house and told Officer Voyvodich he was being paid to watch the plants. The court reasoned such evidence would, at best, show defendant was an accomplice to the principal, Cheng. The court stated, "Somebody else involved only means somebody else was involved. That's all it means." We agree with the trial court's conclusions under the facts of this case.

Defendant was permitted to raise his defense. The jury chose not to believe it.

We find no error. Accordingly, we need not address defendant's third and final argument that cumulative prejudicial error requires reversal.

### III.  DISPOSITION

The judgment of conviction is affirmed.

---

[5] Two of the officers who stopped Cheng and seized the items were not available to testify. The third was under investigation by the District Attorney's Office with regard to a drug scandal; he invoked his Fifth Amendment privilege and refused to testify. Defendant apparently made no attempt to call Cheng, who may also have invoked the privilege. Thus, the evidence defendant sought to introduce to show Cheng's culpability may not have been admissible. Evidence of third party culpability must be admissible in order for its exclusion to be error. (*Abilez, supra,* 41 Cal.4th at p. 502.)

_____
Sepulveda, J.*

We concur:

_____
Margulies, Acting P.J.

_____
Banke, J.

* Retired Associate Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.