Filed 12/11/20  P. v. Gomez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORGE GOMEZ,<br><br>Defendant and Appellant. | B295182<br><br>(Los Angeles County<br>Super. Ct. No. PA087810) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge.  Affirmed in part, reversed in part, and remanded.

Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellant was convicted of premeditated and deliberate attempts to murder four of his abused ex-girlfriend's family members, viz., her mother Gisela C., her aunt Rosa Maria C., and two of her sisters, Leah C. (then three years old) and Aurora C. (11 months old).[1] He was also convicted of committing a misdemeanor hit and run (count seven) while fleeing from police in his car. He had stipulated to the facts charged in count seven without expressly waiving his constitutional trial rights with respect to that count, or being advised on the record that the stipulation had the effect of waiving them.

At trial, appellant's ex-girlfriend, Catherine C., testified (without objection) about three separate occasions on which he hit her, the last of which occurred on December 6, 2016. The jury received evidence of appellant's misdemeanor domestic violence conviction arising from the

---

[1] Because the members of the C. family share a surname, we refer to them by their first names to avoid confusion and to preserve the anonymity of the minor victims.

December 6 incident, and of an attendant restraining order requiring appellant to stay away from Catherine. She further testified, and appellant admitted, that they continued seeing each other until the night of December 17, 2016. That night, after appellant dropped Catherine off at her aunt Rosa's house and she failed to respond to his text messages, he came to Rosa's door and continuously insisted on seeing Catherine, refusing to leave until the police arrived in response to her cousin's 911 call. Though Catherine had been living with her mother Gisela, she decided that night to get away from appellant by moving in with her father, and communicated that decision to appellant.

The next afternoon -- as established by Gisela's and Rosa's testimony, as well as appellant's admissions -- appellant knocked on the door of Gisela's apartment, forced his way in (or refused to leave until Gisela relented), and continuously demanded to see Catherine, despite the women's confirmation that she was at her father's home. When Rosa attempted to call the police, appellant struck the phone from her hand and drew a chef's knife. According to the two women, he then attempted to stab three-year-old Leah, but Rosa shielded Leah with her arm. Appellant then struck Rosa with the knife six times, including on her head and chest. When Gisela fled, holding baby Aurora in her arms, appellant chased her and struck her with the knife seven times, perforating one of her lungs. Aurora also sustained a minor wound to her abdomen and two stab

3

wounds to her thigh. Two of Gisela's neighbors witnessed appellant's attack on her and testified that immediately after the attack, appellant's facial expression looked satisfied and remorseless; one of the neighbors additionally testified that during the attack, appellant's expression looked "really mad" and "like saying . . . , 'Die, you bitch.'" After appellant fled, he sent Catherine a message saying he had done something she would remember him by, along with a picture of his bloody hands. Appellant testified that he began using crystal methamphetamine around the time he first hit Catherine, that he had used it on the morning of the attack, and that he had not been thinking during the attack.

The trial court denied appellant's request to instruct the jury on the heat of passion theory of attempted voluntary manslaughter. Appellant did not request an instruction that provocation can raise a reasonable doubt regarding premeditation and deliberation, and the court did not deliver one sua sponte. The jury convicted appellant of the attempted murders of Gisela, Rosa, Leah, and Aurora, and found them premeditated and deliberate. On each of the attempted murder counts, the court sentenced appellant to a term of 15 years to life. The court ordered the sentences to run consecutively (commenting that it did not know that it had discretion to do otherwise), and imposed fines and fees without determining appellant's ability pay.

On appeal, appellant contends the trial court prejudicially erred at trial by: (1) admitting the neighbors' testimony that appellant appeared to have certain mental

4

states during and immediately after his attack on Gisela; (2) admitting Catherine's testimony about appellant's acts of domestic violence prior to the December 6, 2016 incident for which he was convicted; (3) denying his request to instruct the jury on the heat of passion theory of attempted voluntary manslaughter; (4) failing to instruct the jury, sua sponte, that provocation can raise a reasonable doubt regarding premeditation and deliberation; and (5) accepting his stipulation to the facts alleged in count seven (misdemeanor hit and run) without obtaining a voluntary and intelligent waiver of his constitutional trial rights. He additionally contends that his trial counsel was unconstitutionally ineffective for failing to object to the admission of Catherine's challenged testimony, and that he was prejudiced by the cumulative effect of the court's asserted evidentiary and instructional errors. Finally, he contends the court erred at sentencing by: (1) imposing 15-years-to-life terms on his attempted murder convictions, rather than the proper terms of seven years to life; (2) failing to exercise its discretion whether to run his indeterminate life sentences concurrently; and (3) imposing fines and fees without determining his ability to pay. The People dispute each of appellant's contentions of trial error, but concede that his 15-years-to-life terms on his attempted murder convictions are erroneous, and that the court may address concurrent sentencing and ability to pay at appellant's resentencing hearing.

We conclude that appellant's stipulation to the facts alleged in count seven was tantamount to a guilty plea, and that the record does not affirmatively show he voluntarily and intelligently waived his trial rights with respect to that count. Accordingly, we reverse his conviction on count seven. We otherwise affirm his convictions. We remand for further proceedings on count seven and for resentencing. At resentencing, the court must impose the correct seven-years-to-life sentence on each attempted murder conviction. We do not resolve appellant's contentions concerning concurrent sentencing and ability to pay fines and fees, as the court may address these issues at resentencing.

## PROCEEDINGS BELOW

### A. *Prosecution Case*

The People charged appellant with four counts of attempted murder (Pen. Code, §§ 187, 664; counts one, two, three, and eight); four counts of assault with a deadly weapon (*id.*, § 245, subd. (a)(1); counts 10 through 13); and one count each of resisting an officer by force (*id.*, § 69; count four), recklessly fleeing a peace officer (Veh. Code, § 2800.2; count five), first degree burglary (Pen. Code, § 459; count six), misdemeanor hit and run (Veh. Code, § 20002, subd. (a); count seven), and dissuading a witness by force or threat (Pen. Code, § 136.1, subd. (c)(1); count nine). The People alleged, inter alia, that the attempted murders were premeditated and deliberate. (*Id.*, § 664; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 654 ["The crime of

attempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation"].)

### 1. *Appellant's Possessive and Abusive Relationship with Catherine*

Catherine testified that she and appellant started dating in December 2015, when they were coworkers at a grocery store. Appellant exhibited jealousy throughout their relationship. Sometime before October 2016, she had a conversation with a coworker named Kevin, which upset appellant, who began yelling at Kevin. Catherine finished her shift and left with appellant, who implied he and Kevin had agreed to fight each other and insisted on waiting for Kevin nearby. Though they waited for Kevin, she dissuaded appellant from fighting him, and Kevin eventually left the store without incident. Shortly thereafter, appellant asked Catherine if she wanted to be with him, and she said no. He slapped her. He started kicking her, and pulled her into his car by her hair. Afraid, she told him she wanted to be with him after all, "just so he could calm down."

On October 29, 2016, while Catherine and appellant were both working at the store, appellant demanded to "go through [her] phone," and began to follow her to the break room. His manager told him to get back to work; rather than comply, appellant punched a computer in frustration. The manager told appellant he was suspended until further notice and ordered him to leave. Appellant left with

Catherine, telling her they had both lost their jobs because "if he lost his job, [she] did too." While driving away with Catherine, appellant elbowed her face and punched her ribs multiple times. She was sore after, but did not sustain any injuries. Though nobody but appellant told Catherine she had been fired or suspended, she never returned to work at the store.

On December 6, 2016, Catherine and appellant argued at her home (her mother Gisela's apartment), where he had spent the previous night. Catherine asked him to leave, but he refused. She walked with him to the front of the apartment complex, carrying her baby sister Aurora. Appellant then headbutted her multiple times. She was still holding Aurora when he did so. The police came and arrested him. The following exhibits were received in evidence: (1) a record of appellant's December 8, 2016 misdemeanor conviction for one count of willfully inflicting corporal injury on a person with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a)); and (2) a December 8, 2016 protective order requiring appellant to stay 100 yards away from Catherine.

Gisela testified that after appellant headbutted Catherine on December 6, 2016, while she was holding baby Aurora, the Department of Children and Family Services (DCFS) began visiting Gisela's home. A DCFS agent had Gisela sign an agreement to call the police if appellant came to their home. Appellant was soon released from jail, and he

8

called Gisela to ask to see Catherine.  She forbade him from continuing to see her.

### 2. *Appellant's Violations of the Restraining Order*

Catherine testified that she and appellant continued seeing each other after he was released from jail.  He called Gisela a "bitch" and expressed a belief that she was the one who had called the police on December 6.  On December 17, appellant told Catherine that his life was over as a result of his conviction (which he mistakenly believed was a felony conviction) because it would prevent him from getting a job.  He discussed a desire to stage a scenario in which he would hurt Catherine and then either she would kill him or he would kill himself, making it look like she killed him in self-defense.

Appellant dropped Catherine off at her aunt Rosa's house, at her request.  He soon sent her multiple text messages, but she did not respond because she "wanted him to go away."  She and her cousin, Isaura C. (Rosa's daughter), both testified that when Isaura briefly walked from the house to her car and back, appellant swiftly followed her to the house's front door, which she locked.  Appellant remained at the door and continuously demanded to see Catherine, disregarding Isaura's and her father's demands that he leave.  Isaura telephoned Rosa and, at Rosa's suggestion, called 911, "worried he was going to either force

9

his way inside the house or hurt [her] dad physically."[2] Meanwhile, Catherine remained in Isaura's room, shaking and crying. The police soon arrived, and appellant fled. Catherine's father, at her request, picked her up and took her to his home. She had decided to live with him -- rather than return to Gisela's apartment -- in order to escape appellant.

### 3. *Appellant's Attack on Catherine's Family*

Gisela testified that the following day, December 18, 2016, around noon, she was in her apartment with Rosa (who was visiting to discuss the events at her house the previous night). Three-year-old Leah and 11-month-old Aurora were also there. Appellant knocked on the door. Gisela and Rosa both testified that Rosa told appellant that Catherine was not home, but he refused to believe Rosa and insisted on seeing Catherine. He either forced his way into the apartment (according to Gisela), or attempted to force his way in until Gisela told Rosa to let him in (according to Rosa). Inside, Gisela told him he needed to accept that Catherine had left to live with her father, and asked him to leave, but he refused. According to Rosa, appellant and Gisela engaged in a "heated" argument. Rosa told him she would call the police if he did not leave, and when he still

---

[2] A recording of Isaura's 911 call was played for the jury. Isaura informed the 911 operator that Catherine's boyfriend, who had "a history of domestic violence," was following her and refusing to leave.

10

refused to leave, picked up her phone to call the police. Appellant struck the phone from Rosa's hands.

Rosa testified that appellant shouted "he was going to kill all of [them], that Catherine was going to regret it, [and] that he was going to leave a memory for Catherine that w[ould] last her entire life." Rosa moved to retrieve her phone, but froze when she saw appellant draw a chef's knife from inside his sweatshirt. Appellant turned toward Leah and lashed out at her with the knife, but Rosa moved between them, sustaining a stab wound to her left arm. Appellant then struck Rosa with the knife six times, including on her face and chest. Rosa fell to the ground, and appellant began kicking her. He eventually ceased his attack in order to pursue Gisela, who had fled the apartment.

Gisela corroborated Rosa's account of appellant's attack, including Rosa's testimony that appellant struck at Leah with the knife. Gisela further testified that she ran out of her apartment to seek help from a neighbor, holding Aurora in her arms (as she had been doing since appellant arrived). Appellant followed her and struck her seven times -- four times on her back, twice on her left arm, and once on her head. She fell to the ground, and appellant ran away. She looked at her arm, which appeared to be "almost cut in half," and realized appellant had been stabbing her. Despite her efforts to shield Aurora, the baby had a "small nick" on her abdomen and two stab wounds to her thigh.

One of Gisela's stab wounds perforated her lung. A doctor testified that the perforation had been potentially

11

fatal. Gisela received surgery and was hospitalized for five days. Rosa was hospitalized for three days, and received stitches on her face and staples in her chest. The doctor testified that Rosa's chest wound could have been fatal had it penetrated deeper. Aurora received stitches on her thigh, requiring two layers of them due to the depth of her wounds.

### 4. *Sanchez's and Lopez's Testimony*

Juan Sanchez testified that he and his wife, Judith Lopez, were neighbors of Gisela. On the day of the stabbings, Sanchez saw appellant in front of Catherine's apartment. Though he was shocked to see appellant there because he had seen appellant's recent arrest at their apartment complex, he returned to his own apartment. Shortly thereafter, he heard loud screaming and looked out his screen door.

Sanchez saw Gisela (holding Aurora) exit her apartment and knock at the apartment next door, screaming for help. Appellant emerged from Gisela's apartment. Gisela tried to get away, but appellant chased her. Appellant stabbed Gisela multiple times with a knife. Sanchez testified, "[H]e seemed like he was trying to get to -- just trying to hurt the baby."

The prosecutor asked Sanchez, "How would you describe the way you saw him do the stabbing?" He responded, "I just saw him like really, really -- really mad. To me, like saying, you know, like, 'Die, you bitch.' You know? That's the expression I saw on his face." Appellant's

12

counsel objected that the "characterization" had "gone way beyond what he saw." The court overruled the objection. When prompted to continue his description, Sanchez testified, "Well, just to me, the way I saw him, he was -- he wanted to kill her. He wanted to make sure, you know. Just a lot of hate on his face expression." Appellant's counsel objected on an unspecified ground and moved to strike. The court ruled, "The portion regarding 'he wanted to kill her,' that will be stricken, as that is an improper lay opinion. He can describe [how] he looked angry or looked hateful, but as to the rest, that will be stricken."

On cross-examination, when appellant's counsel asked if appellant left the complex after stabbing Gisela, Sanchez responded, "Yes. He took off running. He stopped at the hallway. He turned around to look at her. He stopped for, I don't know, a couple seconds or so. But when I saw him, when he turned around, his facial expression was like he was just satisfied. Then he turned around and took off." Appellant's counsel objected, on unspecified grounds, to the "satisfied" portion of the testimony he had elicited. Without waiting for or requesting a ruling on his objection, he proceeded to question Sanchez as follows:

"[Appellant's counsel]: Did he look disturbed?

"[Sanchez]: He didn't look disturbed at all.

"[Appellant's counsel]: He looked calm?

"[Sanchez]:  He looked very calm, very sure of whatever it was. . . .  [T]o me he seemed very firm on the way he looked at her.  I don't know any other way to describe satisfaction, but he was just okay. . . .  I didn't see no other emotions on his face.  Or remorse.

"[Appellant's counsel]:  So you can read emotions?

[¶] . . . [¶]

"[Sanchez]:  No.  I cannot read emotion like if I'm perfectly -- but if I see somebody angry or if he -- you can tell when somebody wants to hurt someone.  I mean, I can tell, you know, or when you are sad or mad, or something.  [¶] His expression, he just ha[d] no -- he didn't seem like he had remorse after he looked at her when she was already -- after he did what he did."

Sanchez's wife Lopez corroborated his account of appellant's stabbing of Gisela and his conduct in the hallway. She testified, "He looked back at her, like with a face of --" Appellant's counsel interjected, "Your Honor, the description of the face is one thing, but --"  The court responded, "I understand."  Evidently addressing Lopez, the court continued, "Rather than what you interpreted it to be, can you just show what his facial expression was?"  Lopez responded, "Satisfaction."  Appellant's counsel did not object or move to strike.

14

### 5. *Appellant's Conduct After the Attack*

Catherine testified that on the day of the stabbings, appellant sent her a social media message stating that he was going to ruin her life because she had ruined his, and further stated, "'I did something that you will remember me by.'" He also sent her a picture of his bloody hands.

A Los Angeles Police Department (LAPD) officer testified that he and a partner responded to a 911 call regarding the stabbings. After receiving descriptions of appellant and his car and ascertaining his home address, they parked near his home in their marked LAPD vehicle, and observed appellant driving past. They activated their vehicle's lights and sirens and began to pursue appellant, who "began attempting to flee from [the officers]."[3] During the ensuing high-speed chase, appellant struck a stopped, occupied car and continued fleeing. Appellant eventually overturned his car on an embankment.

After obeying the officers' orders to exit the overturned car, appellant began to flee on foot. He reached a two-story house that was under construction, climbed a ladder to the top of the structure, and threatened to jump to his death. About five hours after the pursuit had begun, appellant surrendered himself. The officers retrieved a chef's knife and a second, smaller knife from appellant's car. The parties stipulated that Gisela's blood was on the chef's knife.

---

[3] The prosecutor played for the jury a video of the pursuit, captured on an officer's body camera.

15

### 6. *The Parties' Stipulation to the Facts Alleged in Count Seven*

During an October 16, 2018 pretrial hearing, the trial court addressed appellant, encouraging him to consider whether he wanted to proceed to trial or instead negotiate a plea. The court advised appellant he had "an absolute constitutional right to have a trial" and commented, "If you feel you absolutely should go to trial, then go to trial." After discussion of other matters, the prosecutor asked appellant's counsel if appellant was willing to plead no contest to count seven (misdemeanor hit and run), observing that such a plea would spare the need to call "a couple of witnesses to prove that charge . . . ." Appellant's counsel responded, "We're willing to stipulate that in the chase he did a hit and run -- he drove badly. He hit someone and did not stop to exchange information, insurance information, and fled the scene." The court interjected, "It can be done by stipulation or a plea. He can stipulate or plead outside the presence [of the jury]. What do you want to do?" Appellant's counsel responded, "I'd rather stipulate in the presence of the jury." The prosecutor and the court indicated their acceptance of the proposed stipulation. The prosecutor added, "So then if he stipulates, then it will be up to the jury to find him guilty." The court responded, "The jury, he'll [*sic*] know as to count seven. He has already stipulated he hit --" Appellant's counsel interjected, "Yeah, yeah. Fine."

After a midday recess in the hearing, the prosecutor asked appellant's counsel, "Counsel, do you . . . stipulate

[appellant] admits the facts pertaining to count seven is [*sic*] true?" Counsel responded, "Yes." The court asked, "So I understand he doesn't want to admit count seven, but based on the stipulation, it encompasses him admitting count seven is true; is that correct?" Counsel responded, "Yes." The court did not ask and counsel did not indicate whether he had discussed the stipulation and its effect with appellant. The court delivered no advisements to appellant regarding the stipulation and asked him no questions regarding it.

During the prosecution's case-in-chief, the prosecutor read the following stipulation: "[Appellant] admits that the facts pertaining to count seven is [*sic*] true." The court asked, "Counsel, do you so stipulate?" Appellant's counsel responded, "Yes, yes." The court did not address appellant, and he did not speak.

## B. *Defense Case*
### 1. *Appellant's Testimony*

Appellant testified that he "started becoming abusive" when he first hit Catherine in response to her expression of a desire to break up. He added, "I was real clingy, possessive of her. I had to talk to her every minute every day, every second." He admitted he had headbutted Catherine twice on December 6, but claimed he had been "trying to give her an Eskimo kiss." He acknowledged he had believed his conviction would prevent him from fulfilling his career goal of becoming a probation officer, and admitted he told Catherine he felt "like [he] had no purpose of living if

17

[he] couldn't be with her." But he denied he felt suicidal at the time, or proposed a plan to stage his death as if Catherine had killed him in self-defense.

Appellant admitted "blowing [Catherine's] phone up" after dropping her off at Rosa's house on December 17, ignoring Isaura's and her father's demands that he leave, and fleeing from the police. He testified that Catherine "possibly" told him soon thereafter that she was moving in with her father. During a recorded interview he gave to the police on the night of the attack, which was played for the jury, he said that shortly after he fled from the police at Rosa's house, Catherine sent him a text message to the effect that she was moving in with her father, "far away." He testified that he "felt like life was over" that night.

The following morning, December 18, he got "frustrated" because Catherine still was not responding to his messages. He retrieved a knife from his home and went to Catherine's apartment. He claimed he brought the knife in order to open a window to her room, which he planned to enter regardless of her permission, so she would be "forced" to talk with him. He testified that he had used a knife to open windows twice before, including once at Gisela's apartment.

At Gisela's apartment, he knocked on the door after unsuccessfully trying to open Catherine's window. He admitted that he refused to leave when told Catherine was not home, and that he used his foot to block the door when Rosa tried to close it. Rosa let him in when Gisela told her to.

18

He described Gisela's behavior inside the apartment as follows: "She told me she [Catherine] wasn't here, that she had moved with her dad for a while, to let things calm down, to give her her space, that -- Gisela is nice. She's a nice woman. She told me, 'You're a good kid, but you can't be doing things like that to my daughter.' [¶] She liked me. She did. She was telling me -- she was giving me advice." When asked if Gisela was calling him names, he responded, "No. She wasn't. She respected me."[4]

He testified that Rosa, on the other hand, was insulting him: "She was calling me a psychopath, that I'm crazy, that I needed help, that I'm a stupid idiot, that I shouldn't be going to her house, putting her house at risk, that I'm no one to be doing that. But I was paying her no attention. [¶] I was paying her no mind until she got a [wine] bottle and said, 'If you don't leave, I'll hit you.' [¶] I said, 'Go ahead. You don't know what I'm feeling. I'm hurt[ing] more than that. Hit me.'" She never tried to hit him with the bottle. Instead, she responded, "'Okay, I'm going to call the cops,'" and picked up her phone. He struck the phone out of her hand. She responded by grabbing him by the collar of his sweatshirt.[5]

[4] When asked on cross-examination whether his conversation with Gisela was a "heated argument," he responded, "No. Not whatsoever. She was pretty compassionate. She was understanding me."

[5] Rosa denied calling appellant a psychopath or a loser, grabbing a wine bottle, or grabbing appellant.

Appellant drew his knife and began stabbing, cutting, punching, and kicking Rosa. He testified, "I wasn't trying to kill her. I was trying to make her hurt, make her feel pain. Make her feel my pain." Shortly thereafter, when asked what he thought he was doing, he responded, "At the time I didn't know what I was doing. I didn't. I just -- this rage got inside of me that I couldn't control. I really couldn't." He ceased his attack on Rosa to chase after and attack Gisela, explaining he panicked when Gisela fled because he did not know what she was going to do. When asked what he was trying to do by chasing and attacking Gisela, he responded, "Hurt her. To let her know how I was feeling." He blamed Gisela for keeping him and Catherine apart. He admitted that after the attack, he sent Catherine a picture of his bloody hand and a message that he had done something she would remember him by; he commented that he was "being stupid" and "wasn't thinking whatsoever."

Appellant denied saying, inside Gisela's apartment, that he would kill the victims or do something Catherine would remember for the rest of her life. He further denied attempting to strike Leah. He claimed he had not intended to kill Rosa or Gisela, explaining that had he so intended, he would have brought a gun or used the knife to slash their necks or disembowel them. He claimed he had been unaware Gisela was holding Aurora, and that he had never intended to hurt Aurora or Leah.

On cross-examination, appellant admitted he "chose" to draw his knife, "chose" to attack Rosa, "chose" to pursue

20

Gisela, and "chose" to stab her rather than strike her unarmed. He testified he had used the smaller knife found in his car to cut himself. He initially denied that he had been trying to kill himself, but after the prosecutor read a portion of his police interview in which he said he had been trying to kill himself, he confirmed he "[p]ossibly" had been.

On redirect, appellant claimed he had been "over-dramatic" when he told the police he had been trying to kill himself. He also testified that he began using crystal methamphetamine in fall 2016, before he hit Catherine for the first time, and that meth made him short-tempered. He further testified he used meth on the morning of the stabbings, in order to gain confidence for his attempt to convince Catherine to reconcile. On further cross-examination, he admitted he had denied using meth during his police interview. He claimed he lied to the police on this point because he was already in enough trouble.

### 2. *Other Defense Testimony*

Appellant called his parents as defense witnesses. They testified they had never known him to be violent before the December 6 headbutting incident. Appellant's mother additionally testified that after the restraining order was issued, she told appellant Catherine could no longer come to their home. The night before the stabbings (when Catherine refused to see appellant at Rosa's house), she told appellant it would be best for him to end his relationship with

21

Catherine, and tried to dissuade him from attempting to talk to her.

A drug recognition expert testified that "explosive, irrational, violent behavior" is a frequent side effect of methamphetamine use. He reviewed two photographs of appellant, one taken around the time of the stabbings and the other taken two or three months before, and testified that they showed appellant's face had developed "sunkenness," a possible side effect of methamphetamine use.

### C. *Jury Instructions and Closing Arguments*

After the prosecution rested, the trial court discussed with counsel whether the prosecution evidence warranted a heat of passion instruction, and opined that it did not. After appellant testified, the court informed counsel that it still believed the evidence did not warrant a heat of passion instruction. It explained, "You cannot go to a place you're not supposed to be with whatever you have on your mind, force your way in, and then somehow claim this as a sudden quarrel or heat of passion . . . ." Appellant's counsel argued that the provocation needed to be evaluated in light of appellant's alleged use of methamphetamine, but the court disagreed. The court also observed, "[H]e created the situation." Appellant's counsel did not request a pinpoint instruction on provocation raising a reasonable doubt regarding premeditation and deliberation.

The court did not instruct the jury on heat of passion or provocation, but did instruct it on voluntary intoxication. In

instructing the jury on premeditated and deliberate attempted murder, the court advised (per CALCRIM No. 601), "A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated." The court instructed the jury on the elements of misdemeanor hit and run. It also instructed the jury (per CALCRIM No. 222), "During the trial, you were told that the People and the defense agreed, or stipulated, to certain facts. . . . Because there is no dispute about those facts you must also accept them as true."

The prosecutor argued appellant intended to kill Gisela, Rosa, Leah, and Aurora, relying on his acts of domestic violence, evidence that appellant was suicidal at the time of the stabbings because he knew Catherine was leaving him permanently, appellant's arming himself with a knife, and the number and locations of the stabbings. The prosecutor further argued appellant's intent to kill was premeditated and deliberate, relying on Rosa's testimony that appellant stated he would kill the victims to give Catherine something to remember, his running after Gisela when she fled, Sanchez's and Lopez's testimony that appellant looked satisfied after the attack, and appellant's message to Catherine stating he had done something she would remember. She argued appellant was angry because Catherine had left him and he no longer had "control over her," leading him to resolve that "if he can't have her, no one can." She argued the jury did not need to deliberate regarding count seven (misdemeanor hit and run),

23

reminding the jury of appellant's stipulation "to all the facts for committing" the offense, and of the instruction requiring the jury to accept stipulated facts.

Appellant's counsel argued appellant never attempted to strike Leah, but did not dispute that he committed assault with a deadly weapon on Gisela, Rosa, and Aurora. He argued appellant, under the influence of methamphetamine, exploded in violence in reaction to the "trigger" of Rosa's attempt to call the police. He further argued that the "irrationality" and "disorganization" of the manner in which appellant assaulted the victims showed he did not intend to kill them, and that even if he did, his intent was not premeditated and deliberate. He twice quoted the jury instruction that "'[a] decision to kill made rashly, impulsively, and without careful consideration of the consequences is not deliberate and premeditated.'" He conceded appellant had committed misdemeanor hit and run.

In rebuttal, the prosecutor again argued, "[I]t finally hit him. This is the end [of his relationship with Catherine], and if he is going down, he is taking her with him. [¶] . . . If he can't have her, no one can." She argued this motive was consistent with his telling Catherine "'If I'm leaving, you're leaving'" when he was suspended and ultimately fired from his job at the grocery store.

### D. *Verdicts and Sentencing*

The jury convicted appellant on all counts, with the exceptions of count four (resisting an officer by force;

24

dismissed by the court prior to the jury's deliberations) and count six (burglary). The jury found true, inter alia, the allegations that each of the four attempted murders was premeditated and deliberate.

In the prosecutor's sentencing memorandum, she represented that the proper sentence on each attempted murder conviction was 15 years to life, and requested that the court sentence appellant to a total of 60 years to life, plus 12 years and two months. In defense counsel's memorandum, he argued the court should order appellant's sentences on each count to run concurrently, relying principally on appellant's alleged use of methamphetamine.

At the sentencing hearing, the court heard statements from Rosa and two of her daughters, as well as from appellant, his parents, and his sister. Appellant's counsel characterized the case as "some horrible *Romeo and Juliet*" arising from an intense first love. He argued for concurrent sentencing, relying on appellant's youth (he was 21 at the time of the stabbings), alleged use of methamphetamine, and lack of a serious criminal history.[6] He concluded, "So the court has discretion with regard to [concurrent sentencing], and I think this is an appropriate case to use it in."

The court responded, "I actually don't know that I do have the discretion." Counsel asked, "For concurrent?" The

---

[6] According to the probation report, appellant had two prior convictions, viz., his December 2016 misdemeanor domestic violence conviction and a February 2016 infraction conviction for speeding (Veh. Code, § 22350).

court replied, "The indeterminate life sentences.  However -- however, you know, these romantic notions that, 'Oh, it was love,' this isn't love.  You don't go at a family, including a toddler and a baby, with a knife and call it love.  Obsession?  Sure.  Aggression, possession, all these things, maybe; but these are not acts of love.  [¶] . . . [¶]  The fact of the matter was that [appellant] went over to Catherine's apartment with knives.  When she wasn't there and he had said his piece to the family and they didn't seem particularly swayed, his reaction was to stab, to chase after Gisela, who was carrying Aurora, a baby.  It didn't all happen in the same place.  He had to chase after her.  She left to try and get help.  [¶] So I don't believe that this whole tragedy of *Romeo and Juliet* -- this isn't romantic.  This isn't a drama.  This isn't a play.  This is real life, where real people got hurt and real people could have died."  Addressing appellant, the court continued, "[T]he bottom line is, you couldn't have Catherine and you were going to make everyone there suffer because of it.  [¶] You're going to have time -- a lot of time -- in prison to reflect and figure out these things; but understand that as I sentence you today, I don't sentence you as a monster or a person with no redeeming qualities.  You're neither of those things.  You're a human being who chose violence and you chose aggression, so much so that even though a baby, an 11-month-old child who is being held by Gisela, that didn't stop you.  [¶] The evidence before this court and before the jury, who was instructed on voluntary intoxication, who heard about the meth use that you said you were using, they

26

heard that and they still believed and the evidence supported in their minds -- and there's nothing contrary that I can see from the evidence -- that if in fact you were using methamphetamine, that that is not what fueled this. This was something inside of you, and that's why in December of 2016, this event occurred."

The court sentenced appellant to an aggregate term of 60 years to life -- comprising 15-years-to-life terms on each of the four attempted murder counts -- plus 10 years and eight months. The court ordered appellant to pay a restitution fine, a criminal conviction assessment fine, and a court security fee.

Appellant timely appealed.

## DISCUSSION

Appellant contends the trial court prejudicially erred at trial by: (1) admitting Sanchez's and Lopez's testimony that appellant appeared to have certain mental states during and immediately after his attack on Gisela; (2) admitting Catherine's testimony about appellant's acts of domestic violence prior to the December 6 headbutting incident; (3) denying his request to instruct the jury on the heat of passion theory of attempted voluntary manslaughter; (4) failing to instruct the jury, sua sponte, that provocation can raise a reasonable doubt regarding premeditation and deliberation; and (5) accepting his stipulation to the facts alleged in count seven (misdemeanor hit and run) without obtaining a voluntary and intelligent waiver of his

27

constitutional trial rights.  He additionally contends his trial counsel was unconstitutionally ineffective in failing to object to the admission of Catherine's challenged testimony, and that he was prejudiced by the cumulative effect of the court's asserted evidentiary and instructional errors.  Finally, he contends the court erred at sentencing by:  (1) imposing 15-years-to-life terms on his attempted murder convictions, rather than the proper terms of seven years to life; (2) failing to exercise its discretion whether to run his indeterminate life sentences concurrently; and (3) imposing fines and fees without determining his ability to pay.

### A. *Sanchez's and Lopez's Opinion Testimony*

Appellant contends the trial court prejudicially erred by admitting (1) Sanchez's testimony that while appellant was stabbing Gisela, his facial expression looked "like saying . . . , 'Die, you bitch,'"; and (2) Sanchez's and Lopez's testimony that after stabbing Gisela, appellant looked satisfied and remorseless.  The People contend appellant's counsel forfeited his objections to the latter testimony by failing to object, and that all the testimony was properly admitted.  Appellant replies that his counsel preserved his objections or, if we find otherwise, was unconstitutionally ineffective.

#### 1. *Principles*

A lay witness may testify to an opinion that is both rationally based on the witness's perception and helpful to a

28

clear understanding of the witness's testimony. (Evid. Code, § 800; see also *id.*, § 170 ["perception" means sensory perception].) "Generally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman* (2006) 38 Cal.4th 344, 397 (*Chatman*).) Similarly, a witness may describe another person's facial expression as consistent with a state of mind. (See *Holland v. Zollner* (1894) 102 Cal. 633, 638-639 (*Holland*) ["[E]xpressions of the face . . . are beyond the power of accurate description. Love, hatred, sorrow, joy, and various other mental and moral operations, find outward expression, as clear to the observer as any fact coming to his observation, but he can only give expression to the fact by giving what to him is the ultimate fact, and which, for want of a more accurate expression, we call opinion"]; Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2020) ¶ 8:668 [scope of permissible lay opinion includes, e.g., testimony that another person "'looked extremely upset,'" "'seemed alert,'" or "'looked nervous'"].)

We review rulings on the admissibility of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724-725.) The admission of evidence violates a defendant's federal due process rights if it renders the trial fundamentally unfair. (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20 (*Covarrubias*); cf. *People v. Abilez* (2007) 41 Cal.4th 472, 503 [exclusion of proffered defense evidence

29

violates federal constitutional right to present defense only in "extraordinary and unusual" circumstances].) Otherwise, the erroneous admission of evidence violates only state law and is reviewed for prejudice under the standard established in *People v. Watson* (1956) 46 Cal.2d 818, requiring reversal only if it is reasonably probable that the defendant would have obtained a more favorable result had the evidence been excluded. (*Covarrubias*, *supra*, at 21.) A "'reasonable'" probability under this test is one sufficient to undermine the reviewing court's confidence in the outcome. (See *In re Richards* (2016) 63 Cal.4th 291, 312-313.)

Generally, "trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal.'" (*People v. Redd* (2010) 48 Cal.4th 691, 729.) Even where counsel objects, counsel "must press for an actual ruling or the point is not preserved for appeal." (*People v. Hayes* (1990) 52 Cal.3d 577, 619; see also 3 Witkin, Cal. Evidence (5th ed. 2020) Presentation, § 401 ["where the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court actually rule. If the point is not pressed and is forgotten, the party may be deemed to have waived or abandoned it, just as if he or she had failed to make the objection in the first place"].) To prevail on a contention of ineffective assistance of counsel, a defendant must prove "'"that counsel's representation fell below an objective standard of reasonableness under prevailing professional

30

norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.'"'" (*In re Crew* (2011) 52 Cal.4th 126, 150.) "[W]hether or not to object to evidence at trial is largely a tactical question for counsel, and a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312 (*Seumanu*).)

## 2. *Forfeiture*

Appellant forfeited his challenges to Sanchez's and Lopez's testimony that after stabbing Gisela, appellant looked satisfied and remorseless.[7] Sanchez first described appellant's expression as "satisfied" on cross-examination, and although appellant's counsel objected (on unspecified grounds), he resumed his cross-examination without requesting or waiting for a ruling on the objection. When

---

[7] The People do not contend that appellant forfeited his challenge to Sanchez's testimony that while appellant was stabbing Gisela, his facial expression looked "like saying . . . , 'Die, you bitch.'" Nor could they. Appellant's trial counsel immediately objected to this testimony on the same grounds appellant now challenges it on appeal, viz., that the testimony was a "characterization" (opinion) not rationally based on Sanchez's perception.

Sanchez again indicated appellant looked satisfied, and added that his face showed no remorse, appellant's counsel did not object. Nor did he object when Sanchez testified for a second time that appellant seemed remorseless. By failing to obtain a ruling on his initial objection (despite his control of the cross-examination), and by failing to object thereafter, appellant's counsel forfeited appellant's challenges to Sanchez's testimony on appeal. (See *People v. Hayes*, *supra*, 52 Cal.3d at 619 ["assuming defense counsel made an objection under Evidence Code section 352, counsel's failure to obtain a ruling is fatal to defendant's appellate contention"]; 3 Witkin, *supra*, Presentation, § 401.) Likewise, by failing to object to Lopez's similar testimony, he forfeited appellant's challenge to her testimony on appeal.

Rather than object to each of Sanchez's characterizations, appellant's counsel challenged their credibility by questioning Sanchez's ability to read emotions, extracting a concession that he could not. For that reason, in addition to the reasons stated below, we conclude defense counsel's failure to preserve appellate challenges to this testimony neither constituted deficient performance nor prejudiced appellant. (See *Seumanu*, *supra*, 61 Cal.4th at 1313 ["There being a plausible reason why counsel did not object, we cannot conclude on this record that counsel's inaction lacked a reasonable tactical basis"].)

32

### 3. *Error*

The trial court acted within its discretion in allowing the challenged testimony, all of which concerned only the appearance of certain mental states, as the witnesses observed in appellant's facial expressions. (See *Holland*, *supra*, 102 Cal. at 636-640 [trial court properly allowed witnesses to testify, based on interactions with third party, that third party appeared irrational at specified time; "'The appearance of a person at a given time is one thing; the opinion of a witness as to the mental condition of that person . . . is quite another'"].) Had the court interpreted Sanchez's testimony that appellant's expression looked "like saying . . . 'Die, you bitch'" as a direct comment on appellant's intent, it presumably would have sustained defense counsel's objection -- as it did when Sanchez later testified that appellant "wanted to kill" Gisela. In sustaining the objection to the latter testimony, the court aptly commented, "[T]hat is an improper lay opinion. He can describe [how] he looked angry or looked hateful, but as to the rest, that will be stricken." It is evident the court reasonably interpreted Sanchez's testimony that appellant's expression looked "like saying . . . 'Die, you bitch'" as an elaboration on his testimony that appellant looked "really mad."[8] Under this reasonable interpretation, the testimony

---

[8]    Sanchez testified, "I just saw him like really, really -- really mad. To me, like saying, you know, like, 'Die, you bitch.' You know? That's the expression I saw on his face." Appellant does

*(Fn. is continued on the next page.)*

33

was rationally based on Sanchez's perception, and the court acted within its discretion in overruling defense counsel's objection to the contrary. (See *People v. Weaver* (2012) 53 Cal.4th 1056, 1086 [percipient witness's testimony that defendant displayed hatred before shooting victim was not impermissible speculation or improper lay opinion]; *Chatman*, *supra*, 38 Cal.4th at 397 [same, regarding percipient witness's testimony that defendant seemed to be enjoying kicking victim].)

The lay opinion cases on which appellant relies are distinguishable, as none concerned opinion on the appearance of a mental state as observed in facial expressions. (See *People v. Torres* (1995) 33 Cal.App.4th 37, 47-48 [trial court erred by allowing police officer to testify regarding meaning of robbery and extortion and to opine defendant's crimes were robberies]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1308-1309 [trial court properly excluded witnesses' proffered opinions that defendant was not "a person given to lewd conduct with children," to the extent they proposed to rely on matters other than their observation of his conduct with children]; *People v. Melton* (1988) 44 Cal.3d 713, 742-745 [trial court erred by allowing prosecutor to elicit testimony about defense investigator's failure to take action on information provided by witness, where prosecutor's principal purpose was to suggest

---

not challenge the admission of Sanchez's testimony that he looked "really mad."

investigator deemed witness not credible, and jury was capable of evaluating witness's credibility for itself]; *People v. Brown* (1981) 116 Cal.App.3d 820, 829 [trial court erred by allowing police officer to opine that defendant worked as "runner" in transaction, where jury had been instructed on definition of "runner" and was equally qualified to determine whether defendant played that role].) Another case on which appellant relies is inapposite, as it concerned arbitrary law enforcement rather than the admission of speculative or otherwise improper opinion. (*Jennings v. Superior Court* (1980) 104 Cal.App.3d 50, 55.)

### 4. *Prejudice*

Even had we found error in the court's admission of Sanchez's and Lopez's testimony interpreting appellant's facial expressions, we would not find prejudice. We find no extraordinary circumstances of the type necessary to render the admission of this testimony a federal constitutional violation. (See *Covarrubias*, *supra*, 202 Cal.App.4th at 20-21; *People v. Abilez*, *supra*, 41 Cal.4th at 503.) Thus, we ask only whether it is reasonably probable that appellant would have obtained a more favorable result had the testimony been excluded. (*Covarrubias*, *supra*, at 20-21.) For the reasons explained below, we conclude it is not.

We are confident the jury would have found appellant intended to kill Gisela (and the other victims) even had the court excluded Sanchez's testimony interpreting appellant's facial expression at the time he was stabbing Gisela. Jurors

35

are equipped to understand the common-sense proposition that facial expressions are not so complex as to betray whether multiple stabbings were intended to kill or merely to injure. Moreover, there was strong evidence of appellant's intent to kill Gisela, including: (1) Rosa's testimony that immediately before launching his attack, appellant shouted that he was going to kill them all and leave a memory for Catherine that would last her entire life; (2) Gisela's testimony that he stabbed her seven times -- four times in her back, twice in her left arm, and once in her head -- and perforated one of her lungs; (3) the expert's testimony that Gisela's perforated lung could have been fatal; and (4) Catherine's undisputed testimony that after the attack, appellant sent her a message depicting his bloody hands and telling her -- in terms echoing his alleged expression of intent to kill at the outset of his attack -- that he had done something she would remember him by.

We are likewise confident that even had the court excluded all the challenged testimony, the jury would have found appellant's intent to kill premeditated and deliberate. A decision to kill is "premeditated" if considered beforehand and "deliberate" if resulting from careful thought and weighing of competing considerations. (*People v. Lee* (2011) 51 Cal.4th 620, 636.) The required extent of reflection may occur quickly. (*Ibid.*) Here, Sanchez's interpretation of appellant's enraged expression was consistent with appellant's defense that he acted in a methamphetamine-influenced explosion of rage, which arguably weighed

*against* a finding of deliberation. Further, Sanchez's and Lopez's testimony that appellant looked satisfied and remorseless was overshadowed by appellant's aforementioned message to Catherine after the attack, which more powerfully evinced his lack of remorse and his satisfaction in having harmed Catherine by harming her family. His message was only one component of the strong evidence of premeditation and deliberation, which also included: (1) multiple witnesses' testimony, including appellant's admission, that he chased after a fleeing Gisela in order to stab her; (2) Catherine's testimony that before the attack, appellant expressed anger at Gisela arising from his belief that she had made the 911 call leading to his domestic violence conviction, which he believed had ruined his career prospects and, by extension, his life; and (3) appellant's admissions that he "chose" to draw his knife, "chose" to pursue Gisela, and "chose" to stab her rather than strike her unarmed.

In sum, even had we found error in the court's admission of Sanchez's and Lopez's testimony interpreting appellant's facial expressions, there is no reasonable probability appellant would have obtained a more favorable result had the testimony been excluded.

## B. *Appellant's Pre-December Acts of Domestic Violence*

Appellant contends the trial court prejudicially erred by admitting Catherine's testimony about appellant's acts of

domestic violence prior to December 2016 (he does not challenge the admission of her testimony about the December 6 headbutting incident, or of his resulting conviction and restraining order). He argues the challenged testimony was inadmissible on two grounds: (1) Evidence Code section 1101 barred its admission because it was character evidence offered to prove his violent disposition; and (2) Evidence Code section 352 barred its admission because its probative value was substantially outweighed by the risk of unfair prejudice. Acknowledging his trial counsel did not object on these grounds below, appellant contends his counsel was unconstitutionally ineffective in failing to do so.

### 1. *Principles*

Generally, "evidence of a person's character or a trait of his or her character," including such evidence in the form of "evidence of specific instances of his or her conduct," is inadmissible "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) However, this rule does not prohibit the admission of "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive . . . ) other than his or her disposition to commit such an act." (*Id.*, § 1101, subd. (b).) "'[T]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.'" (*People v. Fayed* (2020) 9 Cal.5th 147, 191.)

38

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "The evidence barred by Evidence Code section 352 is evidence that uniquely causes the jury to form an emotion-based bias against a party and that has very little bearing on the issues of the case." (*People v. Thornton* (2007) 41 Cal.4th 391, 427.) ""Because a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence."" (*People v. McKinnon* (2011) 52 Cal.4th 610, 655, quoting *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) Motive has probative value regarding premeditation and deliberation; indeed, it is one of three "*Anderson* factors" often considered by courts in assessing evidence of premeditation and deliberation. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10 & fn. 16, citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

### 2. *Analysis*

Appellant forfeited his objection to the admission of the challenged testimony by failing to object in the trial court. (See *People v. Redd*, *supra*, 48 Cal.4th at 729.) We reject appellant's reliance on narrow exceptions to the general rule requiring an objection in the trial court, which apply only

where an objection would have been futile, or the error was so prejudicial that it violated the defendant's federal constitutional rights. (See *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649-650 ["In our view the error [in instructing prospective jurors to lie about harboring racial prejudice] is so shocking, affecting the structural integrity of the trial, that it . . . not only affected the substantial rights of this defendant but, if the conviction were upheld, would tend to impair the integrity of the judiciary"]; *id.* at 648-649 [objection would have been futile in light of trial court's repeated refusal to acknowledge identical error in separate case].) For the reasons stated below, we also reject appellant's alternative contention that his counsel was unconstitutionally ineffective in failing to object.

Appellant's counsel had reason to refrain from objecting under Evidence Code section 1101. The evidence of appellant's pre-December acts of domestic violence was not offered to prove that he had a disposition to commit such acts and, in conformity with that disposition, committed acts of domestic violence against the victims of the charged offenses (who were not in any protected relationship with him, as appellant himself emphasizes). (See Evid. Code, § 1101, subds. (a)-(b).) Rather, as demonstrated by the manner in which the prosecutor relied on the evidence during closing arguments, the evidence was offered to support the prosecution theory of motive, viz., that appellant was motivated to attack Catherine's family to punish

Catherine for leaving him.[9]  The evidence supported the theory by illustrating the depth of his sense of possession over Catherine and the lengths to which he would go to maintain it.  Each pre-December act was triggered by threats to his sense of possession over Catherine, viz., her conversation with a perceived rival for her affections, her resistance to his demand to search her phone, and her expression of a desire to leave him.[10]  Appellant's reliance on the lack of similarity between the prior acts and the charged offenses is misplaced, as the lack of similarity was immaterial to the acts' probative value regarding motive. (See *People v. Fayed*, *supra*, 9 Cal.5th at 191.)  Accordingly, appellant's counsel reasonably declined to make an objection under Evidence Code section 1101.

The same is true regarding an objection under Evidence Code section 352.  Because the evidence supported

---

[9] The prosecutor argued appellant was angry because Catherine had left him and he no longer had "control over her," leading him to resolve that "if he can't have her, no one can."  In rebuttal, she supported this argument with reference to his forcing Catherine to leave her job when he was suspended (immediately before he hit her).  The trial court evidently credited this prosecution theory, telling appellant at sentencing, "[T]he bottom line is, you couldn't have Catherine and you were going to make everyone there suffer because of it."

[10] Thus, contrary to appellant's contention, the testimony was not cumulative to the evidence of the December 6 incident. Catherine did not specify any trigger for appellant's violence on December 6.

the prosecution theory of motive, it had substantial probative value regarding, inter alia, the allegations of premeditation and deliberation. (See *People v. McKinnon*, *supra*, 52 Cal.4th at 655; *People v. Shamblin*, *supra*, 236 Cal.App.4th at 10 & fn. 16.) Considered in a vacuum, the evidence might have tended to evoke "an emotion-based bias" against appellant (see *People v. Thornton*, *supra*, 41 Cal.4th at 427), but this tendency was insubstantial in the context of the unchallenged evidence at appellant's trial. The unchallenged evidence includes appellant's admissions to: (1) being convicted of hitting Catherine while she was holding a baby; (2) violating his resulting restraining order by defying her and her relatives' requests to leave her alone at Rosa's house; (3) attempting to violate the restraining order again by forcing his way into Gisela's apartment in search of Catherine; (4) viciously stabbing Rosa in reaction to her reasonable demands that he leave and her reasonable attempt to call the police; (5) chasing after a fleeing Gisela; (6) viciously stabbing Gisela while she was holding her baby; and (7) sending Catherine a message that he had done something she would remember him by, with a picture of his bloody hands. In addition to appellant's admissions, the unchallenged evidence included Rosa's and Gisela's testimony that appellant attempted to stab three-year-old Leah, Sanchez's testimony that appellant appeared to be trying to hurt 11-month-old Aurora, and evidence that the baby was indeed injured. In this context, the jury's emotions were unlikely to be inflamed by the evidence that he had hit

42

Catherine on two additional occasions (without a weapon, and without inflicting injury), bullied her into leaving her job at a grocery store, and made unfulfilled plans to fight a perceived rival.  Thus, the risk of unfair prejudice did not substantially outweigh the evidence's probative value.  (See Evid. Code, § 352.)  Appellant's counsel reasonably declined to make an objection under Evidence Code section 352.

In sum, although trial counsel's failure to object to Catherine's testimony regarding appellant's pre-December acts of domestic violence forfeited appellant's challenges to the testimony on appeal, this is not the type of "unusual" case in which failure to object implicates the constitutional right to effective assistance of counsel.  (See *Seumanu, supra,* 61 Cal.4th at 1312.)

## C. *Omission of Heat of Passion and Provocation Instructions*

Appellant contends the trial court prejudicially erred by (1) denying his request to instruct the jury on the heat of passion theory of attempted voluntary manslaughter; and (2) failing to instruct the jury, sua sponte, that provocation can raise a reasonable doubt regarding premeditation and deliberation.  In support of both arguments, he identifies two categories of evidence of provocation:  (1) appellant's purportedly "acrimonious" relationship with Gisela in the weeks before the stabbings, during which Gisela forbade him from continuing to see Catherine; and (2) Gisela's and Rosa's actions immediately before appellant attacked them.

43

## 1. *Principles*

A trial court errs in failing to instruct on a heat of passion theory of attempted voluntary manslaughter if the theory is supported by substantial evidence, meaning evidence strong enough to persuade a reasonable jury.  (See *People v. Souza* (2012) 54 Cal.4th 90, 116.)  The theory has both a subjective component and an objective component.  (*People v. Moye* (2009) 47 Cal.4th 537, 541, 549; see also *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.)  To satisfy the subjective component, the defendant must have experienced emotion "'so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.'"  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225.)  To satisfy the objective component, the defendant must have reacted to provocation "'that would cause an emotion so intense that an ordinary person would simply *react*, without reflection . . . .'"  (*Ibid.*; accord, *People v. Moye, supra*, 47 Cal.4th at 550 ["the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].)  "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion.  The claim of provocation cannot be based on events for which the defendant is culpably

44

responsible." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

Even if provocation is inadequate to support a heat of passion theory, evidence of provocation's effect on the defendant's state of mind may raise reasonable doubt about premeditation or deliberation. (See *People v. Rivera* (2019) 7 Cal.5th 306, 328.) "But an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation . . . is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory. [Citation.] The trial court is not required to give such an instruction sua sponte." (*Ibid.*)

### 2. *Analysis*

The trial court did not err in omitting instructions on heat of passion and provocation. Appellant did not request a pinpoint instruction on provocation, and the court was not required to deliver one sua sponte. (See *People v. Rivera, supra,* 7 Cal.5th at 329 [trial court did not err by failing to instruct jury that provocation can reduce premeditated murder to second degree murder, where defendant did not request such instruction].) Though appellant did request a heat of passion instruction, the court properly denied the request because, as explained below, there was no evidence on which the jury reasonably could have relied to find that the victims engaged in provocative conduct sufficient to place

45

an average person in a state of emotion precluding judgment.[11]

There was no evidence that Gisela engaged in adequate provocation. Though Rosa testified that Gisela engaged in a "heated" argument with appellant inside her home (which appellant denied), an average person in appellant's circumstances would have recognized that Gisela had ample reason to do so. Appellant had been convicted of abusing her elder daughter while she was holding her baby daughter, in a manner that resulted in the investigation of her home by DCFS; had violated the resulting restraining order by continuing to see her daughter; had refused to leave her daughter alone at Rosa's house the night before, resulting in a police visit and her daughter's decision to move out of her home; and had forced his way into her home in an attempt to again violate the restraining order. According to appellant himself, even after this behavior on his part, Gisela treated

---

[11]     We reject the People's contention that to the extent appellant's argument for a heat of passion instruction is premised on Rosa's insults and on his federal constitutional rights, he forfeited the argument by failing to rely on those grounds in the trial court. A principal purpose of forfeiture doctrine is to encourage presentation of issues to the trial court, preserving the court's ability to avoid potential errors and thereby conserving judicial resources that might otherwise be spent responding to errors only after the fact. (See *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468-1469; *People v. Butler* (2003) 31 Cal.4th 1119, 1128.) Here, that purpose was fulfilled. Appellant requested a heat of passion instruction and the trial court twice discussed whether the instruction was warranted by the evidence.

46

him with respect and compassion.  All she did was tell appellant to comply with the restraining order and to accept her daughter's desire to end the relationship.[12]  Gisela's conduct was not provocative, let alone so provocative as to cause an average person to act without reflection.

For similar reasons, even if the jury credited appellant's testimony about Rosa's conduct, it could not reasonably have found adequate provocation.  An average person in appellant's circumstances would have recognized that Rosa had reason to verbally lash out at him in response to his abuse of her niece, his behavior at her house the night before (which had brought the police to her home), and his use of force to prevent her from closing Gisela's door.  Similarly, the average person would have recognized that Rosa had reason to attempt to call the police in response to appellant's refusal to leave the apartment, particularly because his conduct constituted an attempt to violate the restraining order by seeing Catherine.  Finally, Rosa had reason to grab appellant in response to his initial aggression in striking her phone from her hands.  (See *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1313 [trial court properly declined to deliver heat of passion instruction, where defendant was "'culpably responsible'" for fight he instigated and therefore could not establish "that *he* was

---

[12]     Similarly, appellant's own mother told him not to bring Catherine home because of the restraining order, and attempted to persuade him to accept the end of the relationship.

47

provoked when [his victim] took him up on the challenge"]; *People v. Oropeza, supra*, 151 Cal.App.4th at 83 [same, where victim intentionally cut off truck in which defendant was passenger, but defendant was responsible for "mutual road rage" that allegedly provoked defendant to shoot victim].)  In any event, Rosa's alleged grabbing of appellant, even accompanied by her alleged insults regarding appellant's intelligence and mental health, was insufficiently provocative to drive an average person into an unreflective state of emotion.  (See *People v. Najera* (2006) 138 Cal.App.4th 212, 215, 226 & fn.2 [victim's pushing defendant and calling him "'jota,'" translated at trial to mean "'faggot,'" was insufficient to satisfy objective component of heat of passion theory].)

The cases on which appellant relies are distinguishable, as they all involved much stronger evidence of provocation than is present here.  (See *People v. Wright* (2015) 242 Cal.App.4th 1461, 1484-1486 [trial court erred by denying defendant's request for heat of passion instruction in prosecution for murdering her ex-boyfriend, where defendant testified she was placed in fear by her ex-boyfriend's frequent threats to deprive her of custody of their son (which followed an unsuccessful attempt to do so), and her ex-boyfriend's fiancé "corroborated that defendant's fear was not unwarranted"]; *People v. Borchers* (1958) 50 Cal.2d 321,328-329 [victim cheated on defendant, repeatedly urged him to kill her, and -- immediately before his fatal shot -- taunted him about being "'chicken'" to shoot her]; *People v.*

*Bridgehouse* (1956) 47 Cal.2d 406, 408, 410, 413 [victim had lengthy affair with defendant's wife, who refused to agree to divorce or to comply with defendant's wish that she not see victim in their minor child's presence]; *People v. Wharton* (1991) 53 Cal.3d 522, 571-572 [defendant's killing of his girlfriend was preceded by weeks of provocation, during which defendant's statements to psychotherapists indicated tension was building and he was losing control, and immediately preceded by his girlfriend throwing a book at him].)

In sum, because the jury could not reasonably have found in appellant's favor on the objective element of the heat of passion theory, the court did not err by denying his request for a heat of passion instruction. Having rejected appellant's claims of evidentiary and instructional error, we also reject his claim that he was prejudiced by the cumulative effect of the asserted errors.

### D. *Stipulation to Facts Alleged in Count 7*

Appellant contends the trial court prejudicially erred by accepting his stipulation to the facts alleged in count seven (misdemeanor hit and run) without obtaining a voluntary and intelligent waiver of his constitutional trial rights.

### 1. *Principles*

"'Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a

49

state criminal trial.' [Citation.] These include the privilege against self-incrimination, the right to trial by jury, and the right to confrontation. [Citation.] . . . A stipulation that admits all of the elements of a charged crime necessary for a conviction is tantamount to a guilty plea. [Citations.] Accordingly, the record must demonstrate that the defendant voluntarily and intelligently waived his constitutional trial rights." (*People v. Farwell* (2018) 5 Cal.5th 295, 299-300 (*Farwell)*.) In other words, "the record must affirmatively demonstrate that the defendant understood the agreement effectively extinguished his trial rights." (*Id.* at 306.)

Our Supreme Court's decision in *Farwell* illustrates the application of these principles to facts remarkably similar to those of the instant case. There, the defendant was charged, inter alia, with driving without a valid license. (*Farwell, supra,* 5 Cal.5th at 298.) The court rejected his offer to plead no contest to the charge, and "explained [his] basic trial rights" to him in discussing the prosecution's plea offer on a separate charge, which he rejected. (*Id.* at 298, 307.) During the defense case-in-chief, the defendant entered into a stipulation that he knowingly drove while his license was suspended -- a stipulation that "encompassed all of the elements of" the charge. (*Id.* at 298-299.) "When the stipulation was entered, the court did not advise the defendant of the constitutional rights implicated by a guilty plea or the stipulation. Nor did it solicit a personal waiver of those rights." (*Id.* at 299.) The court instructed the jury to

accept the stipulated facts as true, and the jury convicted the defendant on the stipulated charge.  (*Ibid.*)  The Court of Appeal upheld the conviction.  (*Ibid.*)  The court acknowledged the stipulation was tantamount to a guilty plea, but found the defendant had voluntarily and intelligently waived his trial rights, relying on:  (1) the trial court's instructions regarding his trial rights during jury selection, in the defendant's presence; (2) the fact that the defendant entered into the stipulation in the midst of a jury trial; and (3) the defendant's prior experience with the criminal justice system, which had resulted in two prior convictions.  (*Id.* at 299, 306.)

Our Supreme Court reversed in a unanimous opinion. (*Farwell*, *supra*, 5 Cal.5th at 308.)  Declining to decide whether the facts on which the Court of Appeal had relied affirmatively demonstrated the defendant's awareness of his constitutional trial rights "as a general matter," the court held that the conviction could not stand because there was "no affirmative showing that [the defendant] understood he was waiving his trial rights by virtue of the *stipulation* entered on his behalf."  (*Id.* at 306; see also *id.* at 307-308 [concluding there was no affirmative evidence the defendant "understood his stipulation would conclusively establish all of the elements of the misdemeanor crime and make the guilty verdict a foregone conclusion"].)  The court observed, "The [trial] court did not discuss the stipulation or its legal

51

effect with [the defendant].  Nor did counsel confirm on the record that she had done so."[13]  (*Id*. at 307.)

### 2. *Analysis*

As in *Farwell,* appellant's stipulation to the facts charged in count seven was tantamount to a guilty plea.  As read to the jury, the stipulation provided that "the facts pertaining to count seven" were true.  The jury must have understood this language to mean that the stipulation "encompassed all of the elements of" the offense.  (*Farwell, supra*, 5 Cal.5th at 298-299.)  Accordingly, the conviction must be reversed unless the record contains affirmative evidence that appellant understood he was waiving his trial rights by virtue of the stipulation.  (See *id*. at 300, 306.)

As in *Farwell,* the record reveals no such affirmative evidence.  When the stipulation was discussed and entered into before and during trial, the trial court did not discuss the stipulation's legal effect with appellant, and his counsel did not represent that he had done so.  (See *Farwell, supra*, 5 Cal.5th at 307; *People v. Cross* (2015) 61 Cal.4th 164, 180

---

[13]    The court rejected a proposed assumption that counsel had discussed the stipulation's legal effect with the defendant, reasoning that on the facts before it, which established that the defendant "would correctly have understood that . . . the prosecution bore the burden of proving him guilty" at the time his counsel entered the stipulation, the proposed assumption could not substitute for affirmative evidence that the defendant understood the stipulation's legal effect.  (*Farwell, supra*, 5 Cal.5th at 307-308 & fn. 9.)

[finding no indication defendant's stipulation to prior-conviction allegation was voluntary and intelligent, where trial court did not ask whether defendant had discussed stipulation with counsel, ask any questions of defendant personally, or inform him of his trial rights].) Moreover, the manner in which the stipulation was discussed before trial might have misled appellant regarding its legal effect. His counsel rejected the prosecution's request that he plead no contest to count seven, and confirmed the court's impression that appellant did not "want to admit count seven" -- potentially obscuring the fact that the stipulation was tantamount to a guilty plea. Further, the prosecutor stated that "if he stipulates, then it will be up to the jury to find him guilty," and neither the court nor appellant's counsel clearly stated, in response, that the stipulation would make the jury's verdict a foregone conclusion.

We reject the People's reliance on various comments and exchanges that made no reference to the stipulation, and on appellant's prior criminal history (which was limited to his misdemeanor domestic violence conviction and an infraction conviction for speeding). Regardless of whether these comments, exchanges, and prior convictions demonstrated appellant was aware of his trial rights in a general sense, neither they nor any other evidence affirmatively demonstrated he understood he was partially waiving those rights by virtue of the stipulation. (See *Farwell, supra*, 5 Cal.5th at 306.) Accordingly, the conviction on count seven must be reversed.

### E. *Sentences on Attempted Murder Convictions*

Appellant contends the trial court erred by sentencing him to a term of 15 years to life on each of his attempted murder convictions, as the proper sentence on each conviction was seven years to life. The People concede the court erred.

The parties are correct that the proper sentence on each conviction, as enhanced by the jury's findings of premeditation and deliberation, was seven years to life. (See Pen. Code, § 664, subd. (a) [typically, punishment for premeditated attempted murder is life]; *id.*, § 3046, subd. (a) [unless otherwise provided by law, minimum determinate term of life sentence is seven years].) A 15-years-to-life sentence applies only where the victim belonged to one of several enumerated categories of law enforcement officers. (*Id.*, § 664, subd. (f) [sentence for premeditated attempted murder is 15 years to life if defendant knew or reasonably should have known that victim was peace officer, firefighter, custodial officer, custody assistant, or nonsworn uniformed employee of a sheriff's department engaged in the performance of his or her duties].) Here, none of the victims belonged to any of the enumerated categories. The trial court appears to have been misled by the prosecutor, who erroneously identified the appropriate sentence on each attempted murder conviction as 15 years to life.

On remand, the court must correct the sentences on appellant's attempted murder convictions. We need not address appellant's other sentencing contentions, as the

court will have an opportunity to exercise its discretion regarding concurrent sentencing at the resentencing hearing, and appellant will have an opportunity to assert his inability to pay fines and fees.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"].)

**DISPOSITION**

Appellant's conviction on count seven is reversed. His other convictions are affirmed. The matter is remanded for further proceedings on count seven and for resentencing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.

56